Wesley A. TUTTLE, Petitioner–Appellant,

v.

STATE OF UTAH, Respondent–Appellee.

No. 93–4236.

United States Court of Appeals,
Tenth Circuit.

June 2, 1995.

As Modified June 23, 1995.

---

Kenneth R. Brown, Salt Lake City, UT, for petitioner-appellant.

J. Frederic Voros, Jr., Asst. Atty. Gen., State of Utah, Salt Lake City, UT (Jan Graham, Atty. Gen., with him on the brief), for respondent-appellee.

Before TACHA and HOLLOWAY, Circuit Judges, and BURRAGE,* District Judge.

HOLLOWAY, Circuit Judge.

Petitioner–Appellant Wesley A. Tuttle (Tuttle) appeals from the district court's denial of his petition for a writ of habeas corpus. We exercise jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

I

On September 26, 1983, Sydney Ann Merrick drove up Parley's Canyon in Utah on an errand for her employer. State Tr. at 936.[1] At approximately 3:30 p.m. that day, a trucker discovered Merrick's body in her car on an off-ramp of Interstate 80 at the Parley's Summit Exit in Summit County. *Id.* at 801–03, 827. She had been stabbed to death.

Tuttle was tried on a charge of first degree murder. He was convicted of first degree murder and sentenced to life in prison. The Utah Supreme Court reversed his conviction for insufficient evidence of first degree mur-

---

* Honorable Michael Burrage, United States District Judge for the Eastern, Northern and Western Districts of Oklahoma, sitting by designation.

1. References to the state trial transcript (State Tr.) and the state trial record (State R.) are to the specific page numbers. Because both the transcript and the record are consecutively paginated, we omit references to volume numbers. References to the federal record are designated ROA (Record on Appeal).

der and remanded to the trial court with instructions to enter a conviction and sentence for second degree murder. *State v. Tuttle*, 780 P.2d 1203, 1218–19 (Utah 1989), *cert. denied*, 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990).[2] On remand the trial court sentenced Tuttle to five years to life for second degree murder.

The facts surrounding the murder are generally not in dispute and are set forth in detail in the decision of the Utah Supreme Court, *Tuttle*, 780 P.2d 1203, the Report and Recommendation of the magistrate judge, ROA doc. 25, and the Memorandum Decision and Order of the district judge, ROA doc. 44. We discuss them as necessary in the body of this opinion, but summarize briefly here.

On the day of the murder, Tuttle, a truck driver, was returning to his home in Evanston, Wyoming from Ventura, California. State Tr. at 1363, 1711. It is not in dispute that Tuttle was in the area of the murder near the time of its occurrence and that he saw the victim. What is disputed is whether Ms. Merrick was stabbed before Tuttle encountered her. Tuttle contends that he found Merrick stabbed and dying in her car, and claims he did not phone the police because of his past criminal record. *Id.* at 1713–17, 1721.

According to eyewitnesses, the victim's car was towed up Parley's Canyon by a truck or truck and trailer. Other testimony placed a truck and trailer and car pulled over on the off-ramp at Parley's Summit. It was there that Sydney Merrick's body was discovered lying in her car. Eyewitnesses testified that they had seen a man and a woman near the truck and car. However, only one witness, Matthew Fish, could identify that man as the petitioner Tuttle. Fish underwent hypnosis about a week after the murder, and his posthypnotic testimony is the focal point of this

appeal. We discuss that testimony in detail below.

## II

### PROCEDURAL HISTORY

#### A. The State Court Proceedings

In Tuttle's direct appeal, the Utah Supreme Court ruled that the trial judge's admission of Fish's hypnotically enhanced testimony was error. *Tuttle*, 780 P.2d at 1211–12. The court stated that "[a] previously hypnotized witness may take the stand, but the witness's testimony must be limited to his or her prehypnotic recall as it has been recorded before hypnosis." *Id.* at 1211. Thus the court held, as have courts in other states, that hypnotically enhanced testimony is inadmissible and a witness who has undergone hypnosis to aid in recall may testify only to recorded statements made prior to the hypnosis. *See id.* at 1211–12 (collecting cases). In this case, the Utah court held that Fish's testimony should have been limited to the statement which Fish dictated to a secretary a few days prior to the hypnosis session. The Utah Supreme Court also concluded that the trial judge erred by not allowing Tuttle to present expert testimony about the unreliability of hypnotically enhanced testimony. *Id.* at 1212. The Utah court did not determine whether the "errors violated Tuttle's federal constitutional rights, as opposed to simply amounting to evidentiary errors under state law...." *Id.* at 1213.

Tuttle claimed that these two errors violated his constitutional rights to confront the witnesses against him and to present evidence on his own behalf. However, the Utah Supreme Court held that the errors were harmless beyond a reasonable doubt. *Id.* at 1213.[3]

2. While his direct appeal was pending, Tuttle escaped from the Utah State Prison. The Utah Supreme Court dismissed his appeal. Following Tuttle's return to custody, the Utah Supreme Court reinstated his appeal. *State v. Tuttle*, 713 P.2d 703 (Utah 1985). Tuttle was subsequently convicted of escape and that conviction was affirmed by the Utah Supreme Court. *State v. Tuttle*, 730 P.2d 630 (Utah 1986). Neither of these prior decisions is relevant to the issues in this current appeal.

3. The court did not specifically cite *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), but it did state that "[e]rrors amounting to violations of the federal constitution require reversal unless they are harmless beyond a reasonable doubt." *Tuttle*, 780 P.2d at 1213. Thus, the court applied the proper standard for harmless error analysis of constitutional violations on direct appeal.

## B. The Federal Court Habeas Proceeding

Tuttle filed this federal habeas petition in May 1991 alleging that (1) admission of the hypnotically enhanced testimony of Fish violated his right to confront witnesses against him; (2) exclusion of expert testimony on the unreliability of hypnotically enhanced testimony violated his right to present evidence on his own behalf; and (3) the Utah Supreme Court should not have held harmless the errors which had occurred in the state trial. ROA doc. 2.[4]

The habeas case was referred to a magistrate judge under 28 U.S.C. § 636(b)(1)(B). After some preliminary rulings,[5] the magistrate turned to the merits of Tuttle's habeas petition. He first concluded that Tuttle's rights under the Confrontation Clause were not violated by the admission of the hypnotically enhanced testimony of Fish. However, he held that the refusal to allow Tuttle to present expert testimony to attack the reliability of hypnotically enhanced testimony violated Tuttle's rights under the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. The magistrate judge then concluded that this erroneous exclusion of evidence was subject to harmless error analysis, but concluded that the error was not harmless beyond a reasonable doubt. He therefore recommended that a conditional writ be granted if the state did not appeal or commence new trial proceedings within 60 days.

The district court declined to adopt the magistrate judge's recommendation. The judge noted that the State's objection to the magistrate's Report and Recommendation went "only to one issue—whether the [Utah] trial court's error constituted harmless error." Memorandum Decision and Order at 5. The district judge said that for purposes of harmless error analysis, he assumed that

both the admission of Fish's posthypnotic testimony and the rejection of expert witness testimony on the unreliability of posthypnotic testimony were constitutional errors. *Id.* at 4 n. 2. The judge then concluded that the admission of the hypnotically enhanced testimony was harmless error and further stated:

> Because the court has found that the inclusion of Mr. Fish's post-hypnotic testimony was harmless, it follows that the improper exclusion of evidence which would impeach that testimony is also harmless. Accordingly, the court finds that the trial court's refusal to allow Tuttle's expert witness to testify was harmless beyond a reasonable doubt.

Memorandum Decision and Order at 22. Holding the errors to be harmless under the standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the district court denied the petition.

## III

## DISCUSSION

As noted, the magistrate judge concluded that petitioner Tuttle's rights under the Confrontation Clause were not violated by the admission of Fish's testimony, reasoning that while hypnosis might have made the cross-examination of Fish more difficult, the record indicated that counsel had the opportunity to effectively cross-examine Fish and to suggest that his trial testimony was unreliable by pointing out his prior inconsistent statements. Report and Recommendation at 31–34. However, the magistrate judge held that Tuttle's rights under the Compulsory Process and Due Process Clauses were violated by the exclusion of expert testimony regarding the unreliability of hypnotically enhanced testimony. The magistrate judge noted that the Utah Supreme Court acknowledged that the state trial judge's ruling, which forced

---

4. In this appeal Tuttle does not argue that harmless error analysis should not be applied.

5. The State filed a motion to dismiss Tuttle's habeas petition for failure to exhaust state remedies as required under 28 U.S.C. § 2254. ROA docs. 6 and 11. The magistrate judge examined the record and concluded that Tuttle had exhausted his state remedies. ROA doc. 20. The

State did not object to this conclusion, and therefore, the district judge adopted the recommendation of the magistrate judge and denied the State's motion to dismiss the petition. *Id.* In this appeal the State does not challenge the finding of exhaustion. Moreover, from the record it is clear that Tuttle exhausted his state remedies.

Tuttle to choose between presenting expert testimony on the unreliability of hypnotically enhanced testimony and attacking the accuracy of eyewitness testimony in general, was error; and that the ruling had the effect of denying Tuttle the right to present expert testimony regarding the unreliability of hypnotically enhanced testimony. Report and Recommendation at 36–37. Under the *Chapman* standard, the magistrate judge held that this exclusion of critical expert testimony was not harmless beyond a reasonable doubt. *Id.* at 54–55. Hence the magistrate judge recommended granting a conditional habeas writ.

The district judge, as noted earlier, assumed that both the admission of Fish's posthypnotic testimony and the exclusion of expert testimony on the unreliability of that testimony, constituted constitutional error, Memorandum Decision and Order at 5 n. 2, and proceeded directly to his harmless error analysis. The judge then reviewed the record and held that the admission of Fish's posthypnotic testimony was harmless. He concluded that it followed that the improper exclusion of expert testimony impeaching Fish's posthypnotic testimony was also harmless. The petition was therefore denied. *Id.* at 22–23.

We are persuaded to follow the general procedure adopted by the district judge. We therefore assume that the errors alleged by Tuttle amounted to constitutional violations and we proceed to analyze whether these errors were harmless.

## Harmless Error Analysis

### A. The Standard for Harmless Error Analysis in this Habeas Case

As noted, the Utah Supreme Court and the federal magistrate judge applied the *Chapman* harmless-beyond-a-reasonable-doubt standard. However, in the period between the federal magistrate judge's report and the district court's decision below, the Supreme Court held that the harmless error standard governing constitutional errors of the "trial type" in federal *habeas* cases is the standard from *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946),

rather than the *Chapman* standard. *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993). Under *Kotteakos,* the standard for determining whether habeas relief must be granted is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.,* quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253; *see Brewer v. Reynolds,* 51 F.3d 1519, 1529–30 (10th Cir. 1995).

In the opinion below, the district judge recognized that *Brecht* had supplanted the *Chapman* standard in federal habeas cases. Memorandum Decision and Order of December 3, 1993, at 6 n. 4. The judge stated that because *Brecht* was not decided until after his denial of the habeas petition, in his ruling from the bench on April 16, 1993, he analyzed "Tuttle's challenge under the *Chapman* standard—recognizing, of course, that this collateral petition is now governed by *Brecht.*" *Id.* at 6 n. 4.

In *Brecht* the Supreme Court concluded that *Kotteakos* was "better tailored to the nature and purpose of collateral review than the *Chapman* standard, and application of a less onerous harmless-error standard on habeas promotes the considerations underlying our habeas jurisprudence." —— U.S. at ——, 113 S.Ct. at 1714.

> The principle that collateral review is different from direct review resounds throughout our jurisprudence.... Direct review is the principle avenue for challenging a conviction. "When the process of direct review—which, if a federal question is involved, includes the right to petition this Court for a writ of certiorari—comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 3392, 77 L.Ed.2d 1090 (1983).

*Brecht,* —— U.S. at ——, 113 S.Ct. at 1719. The Court stated that habeas petitioners would not be "entitled to habeas relief based on trial error unless they can establish that it

resulted in 'actual prejudice.' " *Id.* at ——, 113 S.Ct. at 1722.

During the pendency of the instant appeal, the Supreme Court applied and explicated *Brecht.* In *O'Neal v. McAninch,* —— U.S. ——, ——, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995), the Court held that *"[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." Id.* at ——, 115 S.Ct. at 994 (emphasis added). *"Grave doubt,"* the Court explained, *"mean[s] that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." Id.* (emphasis added).

The Court based its holding in *O'Neal* on three considerations: (1) precedent which recognized that the common law rule placed the burden on the beneficiary of the error to show that the error was harmless; (2) the basic purposes underlying the writ of habeas corpus—protecting individuals from unconstitutional convictions and guaranteeing the integrity of the criminal process by assuring that trials are fundamentally fair; and (3) administrative considerations. *Id.* at —— – ——, 115 S.Ct. at 995–98. The Court rejected the assertion that because a habeas proceeding is a civil proceeding, and because appellants in civil cases bear the burden of showing prejudice, a habeas petitioner must demonstrate prejudice in order to prevail. The Court emphasized that:

> [T]he errors being considered by a habeas court occurred in a *criminal* proceeding, and therefore, although habeas is a civil proceeding, someone's custody, rather than mere civil liability, is at stake. And, as we have explained, when reviewing errors from a criminal proceeding, this Court has consistently held that, if the harmlessness of the error is in grave doubt, relief must be granted. We hold the same here.

*Id.* at ——, 115 S.Ct. at 996 (emphasis in original).

Thus, under the teaching of *O'Neal,* if we determine that an error had a substantial and injurious effect or influence in determining the jury's verdict, *or* if we have grave doubt about whether the error was harmless, the error was not harmless and the habeas petitioner is entitled to relief.

## B. The Harmless Error Standard Applied Here

■ Assuming, as the district judge did here, Memorandum Decision and Order at 5 n. 2, that there were constitutional errors in violation of the Confrontation Clause and the Compulsory Process and Due Process Clauses, we must examine Fish's evidence in light of the entire record to determine what its effect on the jury may have been. Our harmless error review is de novo. *Graham v. Wilson,* 828 F.2d 656, 659 (10th Cir.1987), *cert. denied,* 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988).

■ In reviewing the record, we are mindful of what the Court held in *Kotteakos,* speaking through Justice Rutledge:

> But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. *The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.*

*Kotteakos,* 328 U.S. at 765, 66 S.Ct. at 1248 (emphasis added). Thus, our task is not merely to determine whether there was sufficient evidence to convict Tuttle in the absence of the posthypnotic testimony from Matt Fish. Instead, we must determine, in light of the entire record, whether Fish's posthypnotic evidence so influenced the jury that we cannot conclude that it did not substantially affect the verdict, or whether we have grave doubt as to the harmlessness of the errors alleged.[6]

---

6. At some points in his analysis of the harmless error question, the district judge made state-

In *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986), the Supreme Court stated that harmless error analysis of Confrontation Clause violations "depends upon a host of factors," including "[1] the importance of the witness' testimony in the prosecution's case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [4] the extent of cross-examination otherwise permitted, and, of course, [5] the overall strength of the prosecution's case."

■ We believe these factors are also relevant to the harmless error analysis of the exclusion of expert testimony on the unreliability of posthypnotic testimony. Again, like the federal district judge below, we assume that the exclusion of such evidence was a constitutional error (an alleged violation of the right to compulsory process under the Sixth Amendment and due process under the Fourteenth Amendment). We therefore consider the two claims of error together in order to determine whether the alleged errors had substantial influence on the verdict, or whether we have a grave doubt that they were harmless.

### 1. Matt Fish's Evidence

Two or three days after the murder of Ms. Merrick, Matthew Fish dictated the following statement to a secretary at his place of employment:

> Driving up Parley's Canyon I saw a black flat bed truck with a goose neck trailer towing a small car with a girl in it. The bed on the truck was approximately 25 feet long and it was also black with wire mesh sides. There was some sort of writing on

the doors of the truck in light blue (or possibly red, white, and blue).

> They passed me going up Parley's Canyon. I noticed the girl seemed very uncomfortable. The truck driver seemed to be going very fast. I re-passed them at the top of the summit and they were pulled off at the Summit Park exit right at the crest of the hill. The truck was still connected to the car and the driver of the truck walked back to the car, opened up the driver[']s side door, put his hand on the roof, and started talking. That is the last thing I saw.

> The guy was medium build with a dark baseball cap on wearing a light blue shirt, he had a scroungy appearance.

> The truck was a new Chevy with glossy black paint. There were one or two barrels up against the head board and some type of pipe laying in the back of the truck.

The statement was signed "Matt Fish" and below the signature was a notation, "Summit County Lumber," and "649–5533." State R. at 679. This statement (State Ex. No. 40) was itself offered by the prosecution at trial, but an objection by the defense was made that Fish's memory had already been refreshed by viewing the statement. The Utah trial judge sustained the objection to admission of the exhibit itself, but under Utah Rule of Evidence 803(5) permitted it to be read aloud by Fish as a memorandum of recorded recollection, which was done. State Tr. 1074–75. Petitioner's counsel did not object to Fish's reading aloud the prehypnotic statement. *Id.*

On or about October 4, 1983, which was several months before Tuttle's trial in April 1984, Fish was placed under hypnosis. De-

---

ments which appear to be at odds with the standard laid down in *Kotteakos,* as emphasized above, 328 U.S. at 765, 66 S.Ct. at 1248. In his Memorandum Decision and Order at 17, for example, the judge said that testimony by Fish about writing on the front of the truck, and specifically the word "Apache," may appear important but was cumulative of other evidence and that "Mr. Tuttle would have been convicted without Mr. Fish's post-hypnotic evidence on these points." The district judge also said that "Mr. Tuttle's identification as the driver of the truck was clearly established at trial without the

use of Mr. Fish's post-hypnotic testimony," and the "post-hypnotic testimony of Mr. Fish was not necessary for the conviction of Mr. Tuttle." *Id.* at 19.

As *Kotteakos,* 328 U.S. at 764–65, 66 S.Ct. at 1247–48, and *O'Neal,* —— U.S. at ——, 115 S.Ct. at 995, make clear, the harmless error determination here must be made *"after pondering all that happened without stripping the erroneous action from the whole...."* (Emphasis added). We must proceed with this instruction clearly in mind and determine whether the federal trial judge reached the proper result in any event.

tective Evans of the Park City Police Department then questioned Fish about what Fish had seen at Parley's Summit. A brief portion of the questioning was done by Dr. Michael Decaria, a clinical psychologist who conducted the hypnosis. A second officer was also present but did not participate in the questioning. *See* State R. at 680–92 (transcript of questioning portion of hypnotic session).

At trial on April 18, 1984, Fish testified that he left his home in Salt Lake at 1:53 p.m. driving a two-ton flatbed lumber truck owned by his employer. State Tr. at 1043–44. He stated:

> About 300 yards past Lamb's Canyon I was in the slow lane coming up and a black Chevy truck towing a white Datsun pulled in front of me and I had to shift over to the middle lane. I got about ten yards in front of 'em, looked over as I was going by the driver's side, tried to look inside the cab, couldn't get a real good look at the guy. I was trying to give him a piece of my mind for pulling in front of me.

*Id.* at 1045. He reiterated that the car he saw being towed was a white Datsun and said that there was a young girl inside. *Id.* at 1046. He described the girl as having sandy hair in a "pixy style" cut. When shown a photograph of the victim (State's Ex. No. 8), he said that the hair color and style looked like what he saw. *Id.* at 1046–47.

In his trial testimony, Fish described the truck as "a black Chevy truck with 'Apache' written on a bug deflector on the front of it." State Tr. at 1047. He said he remembered the word "Apache"

> Because after he swerved in front of me and I went on the middle lane and passed him, I got about ten yards in front of him and looked in my rear view mirror and saw "Apache" written on the bug deflector, and I remember thinking what a crazy Indian he was at the time.

*Id.* When shown photographs of the victim's car (State Ex. No. 3) and Tuttle's truck and trailer (State Ex. Nos. 18 and 39), he identified them as the ones he saw near Parley's Summit the day of the murder. *Id.* at 1047–48, 1086.

Fish testified at trial that when he reached the top of the summit, maybe 5 to 10 minutes later, he again observed the truck and the Datsun. State Tr. at 1050. He said that the truck was 15 feet from the car and that they were connected by some sort of chain or steel line. *Id.* at 1052. The driver of the truck walked along the tow line towards the car. The last thing he saw was the man with one hand on the car door and one hand on the roof. Fish testified that the man and woman appeared to be talking. He said that they were the same man and woman he saw driving up the summit. He identified Tuttle in court as the man he saw. *Id.* at 1055–56. Fish was the only eyewitness able to identify petitioner Tuttle at trial.

### 2. The Importance of Fish's Evidence to the Prosecution Case

The State argues that its "case did not hinge on Fish. He was one of many witnesses to the circumstances of the crime." Appellee's Brief at 32. However, the record reveals that the prosecution considered Fish its most important individual witness. In its Memorandum in Opposition to Defendant's Motion to Suppress Testimony of Matt Fish or Disqualify Matt Fish as a Witness in the Defendant's Trial, the State asserted that "[t]he testimony of Matt Fish is *extremely important* evidence that will aid in the search for the truth." State R. at 677 (emphasis added). During closing arguments, the State repeatedly emphasized Fish's testimony:

> [T]he witness who identified the defendant at the scene of the crime, of all the witnesses in this case, Matt Fish has the best opportunity to see and observe the defendant. The reason he does is he gets to see him more often. He sees him three different times. And he has a reason for looking for him; because he's mad, because he pulled in front of him. He saw the word "Apache" and he thinks that's appropriate because a crazy Indian's driving.
>
> He also observes the defendant for the longest period of time. Because he's travelling slower. It's going to take longer to get by him. He's also closer.... The

defendant's vehicle is in the outside lane, Mr. Fish's vehicle is in the inside lane. There is nothing between them other than just a few feet of open space.

*Mr. Fish pointed him out. Mr. Fish identified the defendant as the person who towed Sidney [sic] Merrick to her death.*

State Tr. at 1858–59 (emphasis added).

The defense argued extensively in an attempt to persuade the jury to disregard Matt Fish's testimony. *See* State Tr. at 1879–83; 1884–1887; 1908; 1909. In rebuttal, the State again touted Fish's testimony:

Let's talk about Matt Fish. I would submit that Matt Fish is not the heart of the State's case. He is an important witness, certainly. *In fact, his testimony certainly adds things that no other witness can add. . . .*

*I think it's remarkable what Matt Fish saw. I think he did an excellent job. When you look at the things that he had right I think his power of observation was exceptionally good. . . .*

. . . .

*I think he did a remarkable job.* And as Mr. Adkins indicated, *he was in the best opportunity to view,* he was past [sic], or he passed the defendant three times. He is going the slowest and he had a reason to pay attention.

State Tr. at 1919–22 (emphasis added).

In addition, the Utah trial judge recognized that Fish was an important witness for the prosecution: "The only witness who has identified Mr. Tuttle has been Mr. Matthew Fish. . . . Mr. Fish . . . appeared to be very self-assured, very definite. . . ." *Id.* at 1577.

Fish was the only witness who could identify Tuttle in court as the man with a girl at the location where the murder occurred, and this in-court identification occurred after Fish was hypnotized. No other single wit-

ness could put all the circumstances together the way Fish did in his posthypnotic trial testimony. Thus after hypnosis Fish was the strongest, most helpful individual witness for the prosecution.

On the other hand, Fish's prehypnotic statement, dictated two or three days after the incident, was read to the jury as noted. It gave a substantial part of the details Fish testified to, and this evidence was not objected to or challenged as being a product of hypnosis. Of course, Fish's prehypnotic statement could not, and did not, provide all the details of Fish's posthypnosis trial testimony, which included an in-court identification of Tuttle as the driver of the truck. But in his prehypnotic statement Fish did tell about seeing the black truck and trailer towing a small car with a girl in it, and he said that the truck passed him going up Parley's Canyon; the girl seemed very uncomfortable; Fish repassed them at the top of the Summit and they were still pulled off at the Summit Park exit; the truck was connected to the car; and the driver of the truck walked back to the car, opened the driver's side door, put his hand on the roof, and started talking. All of this prehypnotic evidence is properly to be considered as part of the prosecution's overall evidence.

### 3. The Extent of Cross–Examination and Impeachment Permitted

The magistrate judge concluded that Tuttle's counsel had the opportunity to effectively cross-examine Fish. Report and Recommendation at 31–34. However, although the defense was allowed to cross-examine Matt Fish extensively, the safeguards to insure the reliability of posthypnosis testimony were not all followed. *See Rock v. Arkansas,* 483 U.S. 44, 60–61, 107 S.Ct. 2704, 2713–14, 97 L.Ed.2d 37 (1987); *Robison v. Maynard,* 829 F.2d 1501, 1508 n. 8 (10th Cir.1987).[7]

7. In *Rock* the Supreme Court held that an Arkansas rule that posthypnotic testimony was per se inadmissible violated a criminal defendant's right to testify in his own behalf. In so holding the Court noted that the use of procedural safeguards could reduce, although perhaps not eliminate, the inaccuracies in testimony that hypnosis can cause. 483 U.S. at 60, 107 S.Ct. at 2713–14. The Court suggested the following guidelines: (1)

the hypnosis should be performed by a psychologist or psychiatrist who is independent of the investigation and has special training in the use of hypnosis; (2) the hypnosis should be conducted in a neutral setting with no one present but the hypnotist and the subject; and (3) all interrogation, before, during and after hypnosis, should be tape or videorecorded. *Id.* The Court also noted that "[t]he more traditional means of as-

We feel that because of the circumstances surrounding Fish's hypnosis and subsequent testimony, the ability to cross-examine Fish was impaired. Moreover, the exclusion of expert testimony explaining the unreliability of posthypnotic testimony also impeded Tuttle's defense. Thus, this factor weighs in Tuttle's favor in the harmless error analysis under *Van Arsdall.*

### 4. The Overall Strength of the Prosecution Case

Three of the *Van Arsdall* factors—whether the evidence is cumulative, whether it is corroborated or contradicted, and the overall strength of the prosecution's case—focus on the strength of the evidence as a whole when considered in light of proof admitted or excluded in violation of the Confrontation Clause or the Compulsory Process or Due Process Clauses. Therefore, we will consider them together.

Fish was the most important individual witness for the prosecution. His posthypnotic testimony was more detailed and complete than the testimony of the other eyewitnesses, and only he was able to identify Tuttle in court as the driver of the truck. However, we must consider the combined strength of the testimony presented by other witnesses and Fish's prehypnotic statement, taken together with Tuttle's admissions and actions. Considered in this light, we are persuaded that the overall strength of the prosecution's

case is such that the admission of Fish's posthypnotic testimony, and the exclusion of expert testimony to impeach it, did not have a substantial and injurious effect or influence on the jury's verdict, and we do not have grave doubt about the harmlessness of the constitutional errors asserted. We turn now to our assessment of the combined proof of the prosecution.

Dell Babcock testified that on September 26, 1983, he was riding with his boss westbound down Parley's Canyon around 2:30 to 3 o'clock. He saw a one-ton dark-colored truck with a trailer towing a car east on Parley's Summit. State Tr. at 968–69. The truck had a bug screen that bore the word "Apache." *Id.* Although Babcock testified that he was previously acquainted with Apache Oil Field Services, and that he had seen Apache's trucks and other similar trucks in the field, he stated that the only time he saw a truck with "Apache" on the front was the day of the murder. *Id.* at 967, 971–73. On cross-examination, Babcock said that the car was definitely not towed by a chain, but instead by a white or yellow tow rope or nylon strap. *Id.* at 977. He could not identify the victim's car from the photograph he was shown, and described the vehicle being towed only as a light-colored, medium-sized car. *Id.* at 974. Nor could he say that the truck he had seen at Parley's Summit was similar to one in a photograph he was shown at trial. *Id.* at 970.

sessing accuracy of testimony also remain applicable in the case of a previously hypnotized defendant," including verification through corroborating evidence, cross-examination, expert testimony, and cautionary instructions. *Id.* at 61, 107 S.Ct. at 2714.

In *Robison,* a federal habeas case, we held that the "use of any post-hypnotic testimony is not *per se* a constitutional error. A reviewing court must determine whether safeguards have been employed to insure reliability of the testimony to make it admissible." 829 F.2d at 1508. We concluded that because the state trial judge had found the existence of safeguards in the hypnosis and testimony of the witness, and because there was no evidence contrary to the judge's finding, that finding was entitled to a presumption of correctness under 28 U.S.C. § 2254(d) and *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). The state judge there found the following safeguards: (1) there was a written record of the "substance" of the witness's pre-

hypnosis recall; (2) that record was preserved; (3) the trial testimony did not vary from the prehypnotic statement; (4) the hypnosis was performed in a manner designed to minimize the danger of contamination; and (5) a written record of the hypnotic session was made and maintained. *Robison,* 829 F.2d at 1508 n. 8. *See generally* Martin T. Orne, David A. Soskis, David F. Dinges, and Emily Carota Orne, Hypnotically induced testimony, *in Eyewitness Testimony* 171 (Gary L. Wells & Elizabeth F. Loftus eds., 1984).

Not all of the above safeguards were followed for the hypnosis and testimony of Matt Fish. Although the hypnosis was performed by a psychologist, most of the questioning under hypnosis was conducted by a police officer, and another police officer was present during the session. Moreover, Fish's posthypnotic testimony differed significantly from his prehypnotic statement. Finally, no videorecording of the session was made, and no tape recording of any kind was made of Fish's prehypnosis recall.

David Albrycht testified that on the day of the murder, while driving with his wife and proceeding west over Parley's Summit, he saw a dark truck with a trailer towing a small white car east up the hill. State Tr. at 980–81. He noticed one person in the truck and one in the car. *Id.* at 981. Mr. Albrycht identified photographs of the victim's car (State Ex. No. 3) and Tuttle's truck and trailer (State Ex. Nos. 18, 19 and 39) as similar to those he saw at Parley's Summit. *Id.* at 982, 987. Mr. Albrycht said a 15–20 foot length of chain was connected below the bumper of the white car. *Id.* at 987. Mr. Albrycht described the person in the white car as "very young," with "dirty blonde hair—not blonde, but not brown." *Id.* at 983. When shown a picture of the victim (State Ex. No. 7), Mr. Albrycht said that the hair color was the same as the hair color of the girl in the white car. *Id.*

Mrs. Francis Albrycht testified that around 2:15 or 2:30 on September 26, 1983, she saw a blackish or dark blue truck towing a small white car about halfway between Parley's Summit and Lamb's Canyon. State Tr. at 995–98. She stated that the car was towed by a chain about 20 feet long connected from the truck to the car, and that there was a young girl sitting in the driver's seat who had "short hair, sort of a dirty blonde." *Id.* at 997, 999. She also identified photographs of the victim's car (State Ex. No. 3) and the truck and trailer (State Ex. Nos. 19 and 39) as similar to the ones she saw near Parley's Summit. *Id.* at 998, 1001–02.

From the testimony of the Albrychts the jury had before it substantial evidence that a dark-colored truck with a trailer attached, using a metal chain, towed a white car similar to Ms. Merrick's up Parley's Summit. Babcock's testimony that "Apache" was written on the bug screen of the truck linked the truck to petitioner Tuttle. On the same point, Kenneth Tuttle, petitioner's brother and a co-owner of Apache, testified that only two Apache vehicles had "Apache" written on the bug screen, one a red one-ton truck, the other a black one-ton truck. State Tr. at

1124. Petitioner Tuttle was assigned the black one-ton truck. *Id.* at 1125. Curtis Sessions, another Apache employee, testified that this black truck was the one that petitioner was driving when he returned to the Apache yard on September 26, 1983, after taking a load for Apache to California. *Id.* at 1197–1199. From all the above evidence, the jury could infer that Tuttle was the person who was driving the truck which towed Merrick's car up Parley's Summit.[8]

The testimony of Kent Moffat further strengthened the prosecution's case. Moffat was a passenger in a car his father was driving up Parley's Summit on the day of the murder. State Tr. at 1020. Moffat testified that upon reaching the summit, at approximately 2:30 p.m., he observed a man and a woman standing between a car and a truck and trailer. *Id.* at 1021. He said "It looked to me first like they were just goofing off, I guess. Looked like he was poking her and tickling her, that type of deal." *Id.* at 1021. "And then they were on the other side of the passenger door and I noticed him look like he shoved her in the car backwards. That's when I realized it was violent." *Id.* at 1021–22.

Moffat identified photographs of the victim's car (State Ex. Nos. 2 and 3) as depicting the car he saw. *Id.* at 1026–27. When shown photographs of Tuttle's truck and trailer (State Ex. Nos. 18 and 39), Moffat said that they were similar to the ones he saw the day of the murder. *Id.* at 1031–32. Moffat described the man he saw as six feet tall or taller, with hair over the collar and a receding hair line. State Tr. at 1032. He testified that the man had a mustache and facial hair, maybe two or three days' growth. *Id.* at 1032–33. In the courtroom Moffat could not identify the man he saw at the off-ramp. *Id.* at 1032–33.

In light of the above evidence, we feel that Matt Fish's posthypnotic testimony identifying the truck driver is cumulative of other evidence. Moreover, the substantial circumstantial evidence that Tuttle was at Parley's Summit with Ms. Merrick before her murder

---

8. The prosecution also introduced testimony that Tuttle's truck was equipped with metal chains and that the victim's car showed signs of having been towed recently by chains or cables. State Tr. at 1094–96, 1364.

shows that the in-court identification of Tuttle by Fish was not essential to the prosecution's case.

Martha Kerr, an employee of the Utah State Crime Laboratory, testified about examinations she performed as a criminalist assigned to the serology or hair unit. She examined materials from the Datsun and the truck, including hair, nail clippings and blood. Kerr said that the rearview mirror taken from the white Datsun (State Ex. No. 12), State Tr. at 850, had a reddish-brown stain over approximately half of the mirror area, and a hair was imbedded in the stain. State Tr. at 1278. The blood from the mirror was consistent, as to characteristics considered, with the blood in State Ex. No. 47E (Merrick's blood from her autopsy, State Tr. at 1280, 1411–12). Kerr compared the hair sample from the rearview mirror of the Datsun with hair samples obtained from Tuttle in November 1983 and concluded: "Microscopic characteristics exhibited by Mr. Tuttle were present in the hair from the mirror; therefore, in my opinion the hair on the mirror could have originated from Mr. Tuttle." State Tr. at 1299. On cross-examination Kerr was asked whether she found "one hair on the mirror that [she] testified had characteristics similar to [Tuttle's]," and Kerr said: "That is correct." State Tr. at 1341.

Kerr also testified that among the hair samples taken from Merrick's blouse, one had the dyed characteristics of Merrick's hair; none had characteristics similar to Tuttle's hair; and hairs from Merrick's shirt were from someone other than Tuttle or Merrick. State Tr. at 1342–43. Among hair samples from a pillow in the Datsun, only one had any similarities to Tuttle's and Kerr could not say that this was, or was possibly, from Tuttle. *Id.* at 1343. One hair from Merrick's clothing exhibited follicular tissue and Kerr felt this hair had been removed by force. *Id.* at 1352. Kerr explained that there are various ways hair can be forcibly removed by anything that can attach to it and pull it out of the follicle, such as if one had used a comb on a twisted rat in her hair. *Id.* at 1356.

Tuttle's counsel presented testimony from another expert on hair examination, Ronald Macey. Macey testified that he had examined samples of Tuttle's hair and the individual hair represented as having been taken from the mirror of the small automobile. State Tr. at 1681. He said this hair "did have some similar characteristics to the defendant's hair." However, it matched only a few hairs from Tuttle's head, "and it's very inconclusive.... It could have been from any one of a number of heads." *Id.* at 1682. Macey analyzed hairs from Merrick's clothing and the pillow in her car. The hairs were at least 90% Merrick's; there were a few unidentified hairs, none of which matched Tuttle's hair standard. *Id.* at 1683. At least one hair in this group was forcibly extracted and Macey said it was not Tuttle's hair. *Id.* at 1685. The hair from the mirror was also examined by Macey and he said it was not forcibly removed. *Id.* at 1686.

Kerr also examined four of Merrick's fingernail clippings and found that two of the nails were partially bent back. She found a reddish substance identified as human blood, but no hairs or skin tissue with the nails. State Tr. at 1268–71.

The State also introduced evidence of flight by petitioner Tuttle. Steven Blake, a co-worker of Tuttle's, testified that on September 30, 1983, he received a call from Wes Wilson, who was his boss, inquiring where Tuttle was. *Id.* at 1210–11. Blake told Tuttle that Wilson wanted him (Tuttle) to return Wilson's call. *Id.* at 1210. Tuttle then went to the office trailer where a phone was located. *Id.* at 1211.

Wilson testified that he asked Tuttle if anything had happened, any minor accident, on the way back from California. Tuttle answered "no." State Tr. 1368–69. Wilson told Tuttle that he had received a call from the Sheriff's Department, and Wilson asked Tuttle again if there was any way he could have cut in front of somebody and run them off the road. Tuttle again assured Wilson that nothing had happened. *Id.* Wilson told Tuttle at that time that they (people from the Sheriff's Department) were coming up to look at the truck the following day. *Id.* at 1368–69. Blake testified that Tuttle left im-

mediately after receiving the call from Wilson, and that Tuttle had given no prior indication that he was going to leave Apache. *Id.* at 1212–13. Blake said that Tuttle

> walked from the office trailer over to his trailer, which was a fifth wheel type camper trailer,[9] and started gathering up everything he owned; toys, boots. And they gathered everything together. I mean, they, meaning Curtis Sessions and Mike Tuttle and Wes Tuttle,[10] and they—I observed them put into the back of Wes's little pickup truck a fifth wheel plate that tows his fifth wheel trailer. And they—they put that in the back of the truck, latched onto the fifth wheel trailer, Curtis got on the motor bike that was parked underneath the cutaway portion of the camper-trailer and started it, and Mike and Curtis loaded up the little motorcycle trailer. And they literally packed everything up and left in a matter of maybe five minutes.

*Id.* at 1211–12.

The magistrate judge discounted the evidence of flight. He said it was significant that petitioner Tuttle turned himself in the same day he arrived in Spokane. Report and Recommendation at 49. Tuttle went to Spokane after leaving Evanston, Wyoming.

We feel there was ample evidence to justify an instruction on flight in the state trial court under Utah law. *See State v. Bales,* 675 P.2d 573, 575 (Utah 1983). Moreover, in the opinion on Tuttle's direct appeal, the Utah Supreme Court noted in its harmless error analysis the evidence that "[Tuttle] fled both the crime scene and Evanston." *Tuttle,* 780 P.2d at 1214. Our record shows that an instruction on flight was given. Instruction No. 22, State R. at 829. Thus substantial evidence of flight by Tuttle was before the jury to consider.

Further, the implausibility of Tuttle's version of events strengthened the prosecution's case. Tuttle claimed that on the day of the murder, he stopped his truck on the side of the off-ramp to take a nap. State Tr. at 1712. After being aroused by the sound of a truck on the exit, he went to check his tires. *Id.* at 1713. He noticed a white Datsun 80–100 feet behind his truck and "noticed that there was somebody looked they were layin' on the seat." *Id.* at 1713–14. He could see legs coming out the Datsun's passenger side and thought someone might have been working under the dash. *Id.* at 1714. Tuttle walked back to the car, looked into the driver's side of the car, and saw the body. *Id.* at 1714–15. He ran around to open the passenger side where he saw "a person on the seat full of blood." *Id.* at 1715. He then reached in to check for a pulse. *Id.* at 1716. Tuttle testified that

> When I touched—When I touched her, her hand, it came up with like a reflex to her face. It startled me and scared me.
>
> Q What did you do then?
>
> A I jerked back. I pushed back. I touched her.
>
> Q Okay. When you say you touched her, where did you touch her?
>
> A On her stomach, I believe.

*Id.* at 1716–17. Tuttle said that his first impression was to get an ambulance, but that after seeing the blood on his hands, he thought that no one would believe him. *Id.* at 1716–17, 1721.

On cross-examination, Tuttle testified that he pulled off at the Summit Park off-ramp about 2:00, but certainly no later than 2:10 p.m., State Tr. at 1733, 1735, which was prior to the time the eyewitnesses claimed to have seen the truck and trailer towing the car up the summit. However, the prosecution introduced phone company records showing that a phone call was made to Apache from a rest stop in Orem, Utah at 1:34 p.m. and that the phone call lasted two minutes. *Id.* at 1157, 1162. Tuttle admitted that he made this call. *Id.* at 1753. The prosecution introduced testimony that it is 45.3 miles between that rest stop and the Summit Park off-ramp. *Id.* at 1218. In order to reach the Summit Park off-ramp at the time he said he did, Tuttle would have had to travel over 80 miles per hour. Tuttle testified that his speed between the rest stop and the off-ramp was between

---

**9.** At the time of the murder Tuttle lived at the Apache yard.

**10.** Mike Tuttle is petitioner's nephew.

892

60 and 70. Thus, Tuttle could not have arrived at the off-ramp at the time he claimed. From all the evidence, the jury could infer that the timing was consistent with the prosecution case, and that in light of the identification of the truck by Dell Babcock, Tuttle had towed the victim up Parley's Summit.

## IV

## CONCLUSION

■ We put aside Fish's posthypnotic testimony, for reasons explained above, and thus the prosecution's case against Tuttle was largely circumstantial, though clearly substantial. This factor weighs against a finding of harmlessness. *See Velarde v. Shulsen,* 757 F.2d 1093, 1095 (10th Cir.1985) (per curiam) (the prosecution's case being entirely circumstantial is a factor which weighs against a conclusion of harmless error). Nevertheless, we are persuaded that, considering the whole of the evidence, the *Van Arsdall* factors on harmless error weigh in favor of the prosecution. The overall strength of the prosecution's case, without Fish's posthypnotic testimony, leads us to this conclusion. We are not in grave doubt about our conclusion that the trial errors, asserted as constitutional wrongs, did not have substantial and injurious effect or influence in determining the jury's verdict. We therefore hold that those errors, assuming they were constitutional violations, were harmless.

Accordingly, the decision of the district court denying the petition for habeas relief is **AFFIRMED.**