FILED
United States Court of Appeals
Tenth Circuit

December 20, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RICKY RAY MALONE,

     Petitioner - Appellant,

v.

MIKE CARPENTER, Interim Warden,
Oklahoma State Penitentiary,

     Respondent - Appellee.

No. 17-6027

_____

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:13-CV-01115-D)**
_____

Robert S. Jackson, Oklahoma City, Oklahoma (Sarah M. Jernigan, Assistant Federal
Public Defender, Oklahoma City, Oklahoma, with him on the briefs), for Petitioner-
Appellant.

Jennifer L. Crabb, Assistant Attorney General (Mike Hunter, Attorney General of
Oklahoma, with her on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee.
_____

Before **HARTZ**, **HOLMES**, and **BACHARACH**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Defendant Ricky Ray Malone was convicted in Oklahoma state court of first-

degree murder and sentenced to death. The Oklahoma Court of Criminal Appeals

(OCCA) affirmed Defendant's conviction on direct appeal and denied his petitions for

postconviction relief. Defendant then filed an unsuccessful application for relief under 28 U.S.C. § 2254 in the United States District Court for Western District of Oklahoma. He now seeks relief in this court. We granted a certificate of appealability (COA) on the following issues: (1) whether the trial court's giving erroneous jury instructions on his voluntary-intoxication defense was harmless; (2) whether those instructions deprived him of the constitutional right to a fair trial; (3) whether he was deprived of the constitutional right to effective assistance of counsel by (a) his trial counsel's failure to object to those instructions or (b) his trial counsel's alleged failure to adequately prepare his expert witness in support of the voluntary-intoxication defense; and (4) whether his conviction must be set aside because of the cumulative effect of the above-mentioned errors.

Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we affirm the district court's denial of habeas relief, largely because of the overwhelming evidence of Defendant's guilt.

## I.    BACKGROUND

The OCCA recites the essential facts in its decision on direct appeal, *Malone v. State*, 168 P.3d 185, 189–95 (Okla. Crim. App. 2007), which we summarize. About 6:20 a.m. on December 26, 2003, a woman delivering newspapers in Cotton County, Oklahoma, saw a car parked on the side of the road with a man, later determined to be Defendant, lying in the front seat with his feet hanging out of the vehicle. Thinking the man might be dead, she drove to the nearby home of Oklahoma Highway Patrol (OHP) Trooper Nik Green and alerted him to the situation. Shortly after 6:37 a.m. Green reported to the OHP dispatcher that he had arrived at the scene. When he was not heard

2

from thereafter, other officers were sent to check on him. His body was discovered about 7:15 a.m. What had happened could later be reconstructed by physical evidence, statements by Defendant, and a videotape from a "Dashcam" recorder in Green's vehicle (which shows Defendant and captured much of what Defendant and Green said but does not show Green).

Green found Defendant in the car and saw evidence that the area surrounding the car had been used to cook methamphetamine the previous night. Green roused Defendant, advised him that he was under arrest, and placed a handcuff on his right wrist before he broke from Green's hold. In the subsequent fight Defendant ultimately gained control over Green and demanded that he lie before him with his hands up. It was during this struggle that the Dashcam was turned on.

Defendant threated to kill Green if he moved but promised he would not shoot if Green held still. Green begged Defendant not to kill him, pleading "Please! I've got children." *Id*. at 191. Defendant asked Green for the location of the keys to the handcuffs. After Defendant failed to find the keys on Green's person, Green suggested that there might be another set in his vehicle. Defendant responded that he "[didn't] need to know," triggering further pleas from Green to spare his life. *Id*. Defendant shot Green in the back of the head, waited 11 seconds, and then shot him a second time. Defendant cleaned up portions of the makeshift methamphetamine lab and drove away by 6:55 a.m.

At trial the State called as witnesses four of Defendant's methamphetamine-making partners—his sister Tammy Sturdevant, her boyfriend Tyson Anthony, and a married couple, J.C. and Jaime Rosser. The four lived together in a trailer in Lawton,

3

Oklahoma. All testified that they had spent Christmas day preparing for a methamphetamine cook but when Anthony became ill, Defendant ended up conducting the cook on his own. He left in Sturdevant's car.

Sturdevant testified that Defendant took a gun with him when he left, "just in case there was trouble." *Id.* at 193–94 (internal quotation marks omitted). She next saw Defendant about 8:00 a.m. the following morning, when Defendant told her that he "shot a trooper" and asked Sturdevant to report her car as stolen. *Id.* at 194. She described his account to her of what had happened:

> [Defendant] woke up to a flashlight in his eyes, and an officer made him get out of the car. [Defendant] was on his stomach, with one arm behind his back, and the officer got one cuff on him, but somehow [Defendant] got up. [Defendant] tried to run, but tripped, and was hit on the head a few times, and he and the officer got into a "scuffle" and went into some barbed wire. [Defendant] saw a gun on the ground and picked it up. The officer begged for his life, saying "Jesus Christ, no." [Defendant] also recounted that he said to the officer, "If I wouldn't have done it to you first, you'd have done it to me."

*Id.* at 194 n.30.

Anthony similarly testified that Defendant borrowed his gun the night of the cook "in case he got into trouble with the police." 2005 Trial Tr., Vol. 3, at 672. Anthony recalled that about 8:00 a.m. on the morning of the shooting, Defendant came to his bedroom, said he had shot someone, and asked him to hide Sturdevant's car. Anthony moved the vehicle about 100 yards from the trailer. He saw Defendant again that evening. Defendant had shaved his head and requested that Anthony buy bleach for his hair. Defendant showed Anthony the gun he had used, which Defendant said belonged to "the cop." *Malone,* 168 P.3d at 192.

4

J.C. Rosser testified that he also saw Defendant the morning of the shooting. When Defendant came home, he had a handcuff on his right wrist. Defendant asked Rosser to drive him to Defendant's home in Duncan, Oklahoma. Defendant changed clothes and came out to Rosser's car carrying a white plastic garbage bag. They stopped at Sturdevant's car, from which Defendant retrieved a large black case. Defendant then disposed of the bag—which contained Defendant's bloodied clothes from the shooting— in a wooded area on the way to Duncan. Defendant told Rosser he had killed a policeman and "was real sorry." *Id.* at 193 (internal quotation marks omitted). After arriving at the Duncan home, Defendant retrieved from Rosser's car the gun he said he used to kill Green and the large black case. Defendant showed the gun to Rosser, which Rosser described as having blood, grass, and hair on it. Defendant said he "fucked up" and again said he was "sorry." *Id.* (internal quotation marks omitted).

Jaime Rosser accompanied her husband and Defendant to Duncan. She testified that Defendant told her he shot a "Hi-Po" (highway patrolman) two times in the head and that "on the first shot the bone part of the skull stuck to the gun, and so [I] shot it again to get the gun clean." *Id.* (internal quotation marks omitted). That evening Defendant told her he had "cleaned up" the scene so "there shouldn't be anything left out there to identify [me]." *Id.* (internal quotation marks omitted). But when Mrs. Rosser asked about the police car's video tape, he responded, "Oh, fuck." *Id.* (internal quotation marks omitted).

At trial, Defendant did not deny killing Green. His sole defense was that he did not have the intent necessary for the crime to be first-degree murder. He testified that by

October 2003 he was addicted to methamphetamine, had been fired from his jobs as a firefighter and EMT because of his addiction, and that producing and selling methamphetamine had become his sole source of income. He said that he had not slept from December 4 through December 26 because he was continuously high on methamphetamine. He claimed that on the night of the December 25 cook he was hearing voices and hallucinating. When his back began to hurt during the cook, he took Lortab—an oral narcotic—and passed out. He testified that during the altercation with Green the next morning, he heard "voices in [his] head" telling him to shoot Green because he "was going to get me." *Id.* at 195 (internal quotation marks omitted).

Dr. David Smith, a specialist in addiction medicine, testified as an expert witness for the defense. Defendant first met with Dr. Smith midway through trial for a two-hour interview. Dr. Smith acknowledged that Defendant had initially contended that he did not remember the shooting, but upon learning from Dr. Smith that this type of "blackout" was not consistent with methamphetamine use, Defendant told him that he had experienced hallucinations on the morning of the shooting. Dr. Smith testified that when someone is very high on methamphetamine, the person can experience "amphetamine psychosis," which has the same effect as paranoid schizophrenia and can result in audial and visual hallucinations. *Id.* Dr. Smith further testified that Defendant reported smoking methamphetamine "every hour" and experiencing hallucinations on the night of the cook and morning of the shooting. *Id.* He concluded that Defendant was likely in a state of amphetamine psychosis at the time of the shooting and thus could not form the intent to commit first-degree murder. *Id.* Dr. Smith admitted, however, that Defendant's

6

efforts to avoid detection evidenced "logical, goal-oriented behaviors" that "speak against brain impairment." *Id.* at 203.

The trial court did not properly instruct the jury on the defense theory that Defendant was too impaired by methamphetamine to have the intent necessary to commit first-degree murder. The instruction on the intoxication defense stated:

> The crime of murder in the first degree *has [as] an element the specific criminal intent of Mens Rea.* A person i[s] entitled to the defense of intoxication if that person was incapable of forming the specific criminal intent because of his intoxication.

R., Vol. 2 at 524 (emphasis added). Although the instruction on first-degree murder said that the murder must have been committed with *malice aforethought* and defined the term, the instructions never defined *mens rea* and thus did not inform the jury what intent Defendant's intoxication needed to negate for him to prevail on his defense. Defense counsel did not object to the instructions at trial.

Defendant raised this flaw in the instructions with the OCCA on direct appeal. He contended that the flaw denied him a fair trial and that he was denied effective assistance of counsel by his trial attorney's failure to raise the error with the trial judge. The OCCA agreed that there was a flaw, but it held that the error was harmless beyond a reasonable doubt and that Defendant had not shown sufficient prejudice from his attorney's inaction.

Defendant also raised on direct appeal to the OCCA a claim that his trial attorney provided ineffective assistance by failing to meet with Dr. Smith until midway through the guilt phase of his trial. The OCCA agreed that counsel's performance was deficient

7

but held that Defendant had not shown the requisite prejudice to establish a constitutional violation.

In the final matter relevant to this appeal, the OCCA rejected Defendant's cumulative-error claim, ruling that the only errors were those related to the intoxication-defense instructions, and those errors had already been determined to be harmless.

The OCCA did, however, vacate Defendant's death sentence because of improper victim-impact evidence and inflammatory closing arguments by the prosecution and remanded for resentencing. Defendant was again sentenced to death, and the OCCA affirmed. Defendant sought postconviction relief, which the OCCA denied.

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that when a defendant's claim has been adjudicated on the merits in a state court, a federal court can grant habeas relief only if the defendant establishes that the state-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). As we have explained:

> Under the "contrary to" clause, we grant relief only if the state court arrives
> at a conclusion opposite to that reached by the Supreme Court on a question
> of law or if the state court decides a case differently than the [Supreme]
> Court has on a set of materially indistinguishable facts.

*Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (brackets and internal quotation marks omitted). Relief is provided under the "unreasonable application" clause only if

the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* (internal quotation marks omitted). Thus, a federal court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *See id.* Rather, "[i]n order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (per curiam) (internal quotation marks omitted). To prevail, "a litigant must show that the state court's ruling was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (ellipsis and internal quotation marks omitted).

In addition, AEDPA establishes a deferential standard of review for a state court's findings of fact. "AEDPA . . . mandates that state court factual findings are presumptively correct and may be rebutted only by 'clear and convincing evidence.'" *Saiz v. Ortiz*, 392 F.3d 1166, 1175 (10th Cir. 2004) (quoting 28 U.S.C. § 2254(e)(1)).

The standard of review with respect to harmless error deserves special attention. On direct appeal, reversal is required for constitutional error unless the error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). But a higher threshold must be satisfied for a state prisoner to obtain postconviction relief in federal court. The test is whether the error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637

9

(1993) (internal quotation marks omitted). A petitioner prevails under *Brecht* if the court is left with "grave doubt" about whether the error was harmless. *O'Neal v. McAninch*, 513 U.S. 432, 434–35 (1995).

*Brecht*, however, predated AEDPA. Under § 2254(d)(1) a federal court can grant relief only if the state court's application of Supreme Court law was unreasonable. This implies that review of a state court's *Chapman* harmlessness analysis is for unreasonableness. So which standard prevails—*Brecht* or § 2254(d)(1)? The Supreme Court has answered the question by saying that both apply. Even after the enactment of AEDPA, *Brecht* must be satisfied for a state prisoner to obtain federal habeas relief, regardless of "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the [*Chapman* standard]." *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007). Given the "frequent recognition that AEDPA limited rather than expanded the availability of habeas relief," the Court thought it "implausible that, without saying so, AEDPA replaced the *Brecht* standard of "'actual prejudice' with the more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable." *Id.* at 119–20 (citations and further internal quotation marks omitted). The Court added that because the AEDPA standard for granting relief is easier to satisfy than the *Brecht* standard (thinking this comparison so obvious as to require no further explanation), "the latter obviously subsumes the former." *Id*. at 120.

As the Court later explained, however, this does not exclude the application of AEDPA in the harmless-error context. In *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015),

the Court reviewed a decision by the California Supreme Court that a constitutional error was harmless beyond a reasonable doubt under *Chapman*. Although the petitioner needed to "meet the *Brecht* standard" for the Court to grant habeas relief, that "[did] not mean . . . that [the] state court's harmlessness determination ha[d] no significance under *Brecht*." *Id.* Rather, because the California "decision undoubtedly constitute[d] an adjudication of [the] constitutional claim 'on the merits,' . . . the highly deferential AEDPA standard applie[d] [and the Court could] not overturn the California Supreme Court's decision unless that court applied *Chapman* in an objectively unreasonable manner." *Id.* (further internal quotation marks omitted). The Court thus clarified that *Brecht* did not "abrogate[ ] the limitation on federal habeas relief that [AEDPA] plainly sets out." *Id.* Accordingly, although a federal court reviewing a state conviction need not "formally apply both *Brecht* and AEDPA," AEDPA still "sets forth a precondition to the grant of habeas relief." *Id.* (brackets and internal quotation marks omitted). In other words, as we understand the Court, satisfaction of the AEDPA/*Chapman* standard is a *necessary* condition for relief (that is, failure to satisfy the standard requires denial of relief), but satisfaction of the standard is not a *sufficient* condition for relief because *Brecht* must also be satisfied. *See Jensen v. Clements*, 800 F.3d 892, 901–02 (7th Cir. 2015) (describing standard of review when state court holds that error was harmless).

## III.    DISCUSSION

The issues before us relate to the instructions on the intoxication defense and the preparation of Dr. Smith as an expert witness for the defense. We begin by discussing the pertinent instructions.

11

## A. Intoxication Jury Instructions

As Defendant states in his opening brief, he "does not dispute that he killed Trooper Green, but he argues he did not do so with the specific intent required for first-degree murder." Aplt. Br. at 41. His complaint is that "the jury's ability to consider the intoxication defense and, consequently, its ability to consider the lesser included offense instruction were affected by . . . instructional errors." *Id.* at 42.

The instruction on first-degree murder, which Defendant does not challenge, informed the jury that it could not convict Defendant of that crime absent malice aforethought:

> No person may be convicted of murder in the first degree unless the State has proved beyond a reasonable doubt . . . the death was caused with malice aforethought. . . . 'Malice aforethought' means a deliberate intention to take away the life of a human being. As used in these instructions, 'malice aforethought' does not mean hatred, spite or ill-will. The deliberate intent to take a human life must be formed before the act and must exist at the time a homicidal act is committed. No particular length of time is required for formation of this deliberate intent. The intent may have been formed instantly before commission of the act.

R., Vol. 2 at 498–99.

The instructions also explained that if the jury found Defendant not guilty of first-degree murder because of his intoxication, it could convict him of second-degree murder:

> It is the burden of the State to prove beyond a reasonable doubt that the defendant formed the *specific criminal intent* of the crime of murder in the first degree. If you find that the State has failed to sustain that burden, by reason of the intoxication of [Defendant] then [Defendant] must be found not guilty of murder in the first degree. You may find [Defendant] guilty of murder in the second degree if the State has proved beyond a reasonable doubt each element of the crime of murder in the second degree.

*Id.* at 526 (emphasis added).

12

But the instructions failed to clearly connect Defendant's intoxication defense to malice aforethought. Instead, as previously noted, the instruction on the intoxication defense stated:

> The crime of murder in the first degree *has [as] an element the specific criminal intent of Mens Rea*. A person i[s] entitled to the defense of intoxication if that person was incapable of forming the specific criminal intent because of his intoxication.

*Id.* at 524 (emphasis added). The problem is that *mens rea* is not defined in the instructions, so the instructions did not expressly inform the jury that Defendant would not be guilty of first-degree murder if his intoxication made him incapable of acting with malice aforethought.

Defendant also points to a problematic definitional instruction which read:

> "Incapable of Forming Special Mental Element" is defined as the state in which one's mental powers have been overcome through intoxication, rendering it impossible to form the special state of mind known as *willfully*.

*Id.* at 527 (emphasis added). The term *Incapable of Forming Special Mental Element* does not appear elsewhere in the instructions, and Defendant contends that the use of "willfully" in that instruction "may very well have misled jurors into believing first-degree murder was merely a general intent crime with the mental state of *willfully*." Aplt. Br. at 28.

The OCCA agreed with Defendant that the *voluntary-intoxication* instruction was "incorrect, confusing, and legally nonsensical" because of its use of the undefined term *mens rea*. *Malone*, 168 P.3d at 198. And it noted that the inclusion of the irrelevant

13

"willfully" instruction was "improper." *Id.* at 199–200 n.63. But it ruled that the errors were harmless.

We hold that the OCCA harmlessness decision was not contrary to or an unreasonable application of Supreme Court precedent.[1] *See Ayala*, 135 S. Ct. at 2198–99; 28 U.S.C. § 2254(d)(1). It was not contrary to Supreme Court precedent because it applied the harmless-beyond-a-reasonable-doubt standard of *Chapman*. *See Malone*, 168 P.3d at 201 & n.68 (citing *Chapman v. California*). And it explicitly held that the voluntary-intoxication instruction "was harmless beyond a reasonable doubt." *Id.* at 203. (We will later address the OCCA's holding on the *willfully* instruction.)

Defendant makes an interesting, but wholly unpersuasive, argument that the OCCA actually held that the error in the voluntary-intoxication instruction was not harmless. He points out that the OCCA referred to the error as "plain error" and stated that its review of the issue was for "plain error" because the issue had not been raised at trial. *See id.* at 197, 203. He then notes that under Oklahoma law "a finding of plain error entails as a component that such error resulted in a violation of substantial rights," and concludes that when the OCCA said that giving the instruction was plain error, it was holding that the erroneous instruction violated his substantial rights. Aplt. Br. at 30. But this is wordplay. To be sure, one of the elements that must be proved for a defendant

---

[1] The State argues that, as a preliminary matter, habeas relief is not available for the errors in the jury instructions because they were not so fundamentally unfair as to deny Defendant a fair trial and hence did not amount to a constitutional violation. (This relates to the second issue on which we granted a COA.) We assume, without deciding, that the errors Defendant identifies in the jury instructions were of constitutional magnitude.

"[t]o be entitled to relief under the plain error doctrine," is "that the error affected [the defendant's] substantial rights." *Hogan v. State*, 139 P.3d 907, 923 (Okla. Crim. App. 2006). But the OCCA was not saying that Defendant had satisfied all the requirements for relief under the plain-error doctrine. After all, it denied relief. One of the elements that must be proved for a defendant to obtain relief under the plain-error doctrine is "that the error is plain or obvious." *Id*. The OCCA was simply noting that this element had been satisfied. It makes no sense to say that when the court declares that this element is satisfied—that is, there has been a determination that an error was "plain"—it is necessarily declaring also that the defendant has satisfied the separate requirement that the error affected his substantial rights.

We add that Defendant's reliance on *Kyles v. Whitley*, 514 U.S. 419 (1995), is misplaced. In that case the Supreme Court held that once a reviewing court has determined that there has been a violation of the constitutional right to government disclosure of favorable evidence under *United States v. Bagley*, 473 U.S. 667 (1985), "there is no need for further harmless-error review." *Kyles*, 514 U.S. at 435. It so held because the *Bagley* issue has a built-in prejudice component—a court cannot determine that there has been a *Bagley* violation without first determining that there is a reasonable probability that the failure to disclose affected the result of the defendant's trial. *See id*. But here, as explained above, the OCCA's statement that there was "plain error" encompassed no determination regarding prejudice.

In any event, it cannot be gainsaid that the OCCA did make a *Chapman* determination. It concluded its discussion of the issue by saying: "Consequently,

15

although we find plain error in the trial court's failure to properly instruct [Defendant's] jury on his voluntary intoxication defense, we do not hesitate to conclude that this error was harmless beyond a reasonable doubt in this case." *Malone*, 168 P.3d at 203.

The OCCA's determination that the error in the voluntary-intoxication instruction was harmless was an eminently reasonable application of *Chapman*. That ruling rested on two strong foundations. First, despite the incorrect instruction, the jury could not have had any question about what it had to decide. Second, no reasonable jury could have decided otherwise on the evidence at trial.

The OCCA explained the first point as follows:

[U]pon a thorough review of the entire record in this case, this Court is convinced that despite the inadequacy of the jury instructions, no juror could possibly have been unaware that [Defendant's] defense was voluntary intoxication and that he should prevail on this defense if he could establish that due to his drug-induced intoxication, he did not deliberately intend to kill Green. A review of the transcripts in this case makes readily apparent that [Defendant's] fundamental defense—from opening statements to closing arguments of the first stage of his trial—was that his methamphetamine use, coupled with his use of Lortab, left him so intoxicated that he was unable to and did not intend to kill Trooper Green.[69]

> [69] [Defendant's] attorney noted early in her opening statement that the case would be about "methamphetamine . . . what it does to a person, how it affects a person's life, and how it can ruin lives—not only of the person taking it, but of others." Defense counsel concluded her opening statement by telling the jury that Dr. Smith would tell them "that a person who is using methamphetamine as much as these people were using, and particularly [Defendant], cannot form the intent to do anything. They cannot form the intent to commit a crime." In her first-stage closing argument, defense counsel argued that [Defendant] "was a paranoid schizophrenic when he was on that road and he was awakened by Nik Green. He could not form the intent." And she concluded her closing argument as follows: "We would submit to you that

16

> [Defendant] was so intoxicated on methamphetamine and Lortab that he did not and could not have physically formed the thought, whether that be a second before, an hour before, or a day before, to kill Trooper Nik Green. He did not have the ability to do that because he was smoking meth every hour on the hour, and taking 40-some Lortab a day. He could not do that. And we would request that you find in our favor."

*Id.* at 201 & n.69

In support of this analysis we further note that the instructions, although failing to expressly connect Defendant's intoxication defense with the intent of malice aforethought, did not affirmatively mislead the jury. They required the jury to find malice aforethought to convict Defendant of first-degree murder and explained that malice aforethought requires an intent to kill.

The essential point here is that the erroneous instruction on voluntary intoxication did not prevent Defendant from raising his voluntary-intoxication defense. Indeed, that defense was the entire thrust of the defense case. The problem with the instruction is that it was not sufficiently precise. It said that intoxication could establish lack of the requisite "mens rea," but it did not define that term. As the OCCA's discussion shows, however, that definition was supplied by the attorneys, who agreed that the question before the jury was whether Defendant was so affected by methamphetamine that he could not form the requisite malice aforethought. *Cf. Boyde v. California*, 494 U.S. 370, 380–81 (1990) (in assessing whether ambiguous instruction, which was "subject to an erroneous interpretation," was ground for reversal, Court said: "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same

17

way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, *with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting*." (emphasis added)).

The context provided by the presentation of evidence and argument by trial counsel also requires us to reject Defendant's argument that the OCCA engaged in unreasonable fact finding when it ruled both that the instructions were erroneous and that the error was harmless beyond a reasonable doubt. It was not inconsistent or unreasonable for the OCCA to observe that the "jury instructions did not, *by themselves*, adequately or accurately inform the jury that [Defendant] should prevail on his intoxication defense if he could establish that due to methamphetamine intoxication . . . he was unable to form the required malice aforethought for first-degree murder," *Malone*, 168 P.3d at 200 (emphasis added and internal quotation marks omitted), but go on to hold that—*in light of the context provided at trial*— "no juror could possibly have been unaware that [Defendant] . . . should prevail on [his] defense if he could establish that due to his drug-induced intoxication, he did not deliberately intend to kill Green." *Id.* at 201.

The error here was wholly unlike that in the cases relied upon by Defendant where we held that instructional errors were harmful. In each of those cases the erroneous instruction precluded a defense. In *Taylor v. Workman*, 554 F.3d 879, 886 (10th Cir. 2009), the instruction on second-degree murder required the State to prove that the defendant's conduct was "not done with the intention of taking the life of *or harming* any

18

particular individual."  As a result, the defendant could not be convicted on the lesser offense of second-degree murder if the jury found that he intended only to harm someone, even if he did not have the intention to take a life—the exact defense on which the defendant was proceeding.  Similarly, at the penalty phase of the death-penalty trial in *Baer v. Neal*, 879 F.3d 769, 779 (7th Cir. 2018), the trial judge improperly instructed the jury that it could not consider intoxication unless it was involuntary, thus nullifying the defendant's mitigation evidence and argument on voluntary intoxication.  In this case, in contrast, defense counsel was fully able to present evidence and argue the intoxication defense.

As for the second foundation of the OCCA's harmless-error ruling—that no reasonable juror could have found that Defendant was too intoxicated by methamphetamine to deliberately intend to kill Green—the court wrote as follows:

> The real problem for [Defendant] was not his jury instructions.  The problem was that no reasonable juror who heard all the evidence in the first stage of his trial could possibly have concluded that he was unable to form "malice aforethought" at the time of the shooting or that he did not deliberately intend to kill Trooper Green. . . . The evidence in this case, though not uncontested, was overwhelming and clearly established that [Defendant] knew what he was doing and deliberately chose to shoot and kill Green. . . .

> [Defendant's] testimony about what happened and his lack of comprehension at the time of the shooting was thoroughly impeached by the State, mainly by going through the audio contents of the Dashcam video, in addition to the physical evidence at the crime scene. . . . The prosecutor focused particularly on the theme that [Defendant's] words and actions, both during his encounter with Green and in the days afterward, were logical and goal-oriented and did not suggest that [Defendant] was experiencing any sort of disconnect from reality.  The prosecutor cross examined [Defendant] about the fact that he never mentioned anything to his friends about seeing things or hearing "voices" on the morning of the

19

shooting.[73]  [Defendant] acknowledged on cross examination that he was "solely responsible for this trooper's death," and that he shot him "[t]o make sure he don't get up" and "to keep him down."  Although [Defendant] would not ultimately admit that he intended to kill Green, his own statements—on tape and afterward—as well as the two close-range shots fired purposefully into the back of Green's head, leave no reasonable doubt about [Defendant's] intent.

> [73] In all of [Defendant's] statements to his friends after the shooting, he consistently depicted the incident as one in which he knowingly and intentionally killed the highway patrol trooper who was attempting to arrest him.  In fact, the allegation of hearing "voices" around the time of the shooting was not even raised by [Defendant] or his counsel until after the State had rested its case—after [Defendant] met with Dr. Smith over the weekend break.

Furthermore, although [Defendant] presented an impressive expert on methamphetamine and its potential effects generally, Dr. Smith's case-specific testimony about [Defendant] and his likely mental state at the time of the shooting was thoroughly and convincingly impeached by the State.[74]  The State demonstrated, through cross examination, that Smith had met with [Defendant] for at most two hours, on a single occasion, in the middle of his trial; that Dr. Smith was remarkably unquestioning when it came to accepting the credibility of [Defendant's] statements; that he could not verify [Defendant's] reports regarding the extent of his drug use at the time; that he did not talk to any of [Defendant's] family members; and that Dr. Smith did not seriously consider or take into account evidence that contradicted [Defendant's] account to him.[75]

> [74] Dr. Smith acknowledged that he was neither a psychiatrist nor a psychologist and that he had not administered any tests on [Defendant].  At one point Smith testified, "[M]y only role was to interview him to determine whether he had a methamphetamine addiction problem."

> [75] When cross examined about the fact that [Defendant] talked to four different people about what happened and consistently described the events as him purposefully killing the trooper, with no mention of "voices" or seeing nonexistent threats, Smith simply maintained that "there was a lot of conflict in the record" and that he "really [had] no opinion on that." Smith testified that his evaluation of [Defendant] was based

upon the Dashcam video and [Defendant's] statements to him.

In fact, Dr. Smith acknowledged that up until the preceding weekend, [Defendant] had maintained (and Smith's expected testimony had been) that [Defendant] had a "total blackout" about the shooting and did not remember anything, but that after meeting with Smith—who informed [Defendant] that such memory loss "didn't make sense" in the methamphetamine context—[Defendant] finally provided what Dr. Smith "perceived was an accurate history," *i.e.*, the story about [Defendant] hearing voices.[76] Smith acknowledged that there was nothing in the Dashcam exchanges between [Defendant] and Green that was illogical or that suggested [Defendant] was delusional. Smith was also forced to acknowledge, when presented with the extensive evidence about [Defendant's] efforts to avoid being caught, that all of these actions were examples of "logical, goal-oriented behaviors," and that all of them "speak against brain impairment."[77]

> [76] Smith acknowledged that [Defendant] lied to him about not remembering what had happened. Smith testified, however, that [Defendant] told him that the reason he had not previously informed his current counsel about what he remembered was that a former attorney had told him not to do so.

> [77] Smith used the phrases "logical, goal-oriented behaviors" that "speak against brain impairment" like a mantra in his testimony on cross examination.

Although [Defendant] presented a bare prima facie case of intoxication and was able to produce an expert who would say that he didn't think [Defendant] "could have formed the intent to commit murder in the first degree," [Defendant's] testimony and that of his expert were thoroughly and convincingly impeached on the issue of whether [Defendant] could have and did deliberately intend to kill Trooper Green. While [Defendant] may well have experienced "methamphetamine psychosis" at some point . . . no reasonable juror could have concluded, based upon the entire record in this case, that he was in such a state at the time he shot Green or that he did not deliberately intend to kill Green. Consequently, although we find plain error in the trial court's failure to properly instruct [Defendant's] jury on his voluntary intoxication defense, we do not hesitate to conclude that this error was harmless beyond a reasonable doubt in this case.

*Malone*, 168 P.3d at 201–03.

The recited evidence of intent is extraordinary. The way Defendant executed the murder is itself powerful evidence. In *Grissom v. Carpenter*, 902 F.3d 1265, 1290–91 (10th Cir. 2018), we said that a second-degree murder instruction would have been inappropriate at the trial of a similar crime; we explained that:

> [N]o juror could have reasonably found that [the defendant] did not intend to take the life of [the victim]. Specifically, the evidence clearly established that [the defendant], after wrestling with [the victim's friend] and shooting and seriously injuring her, chased [the victim] from the living room of [her friend's] house into a bedroom and, despite her pleas for mercy, proceeded to shoot her not once, but twice in the head at close range.

And here there was additional compelling evidence of Defendant's lucidity and ability to form intent: his exchange with Green—including his instruction that Green lie before him with his hands up, his threat to kill Green if he moved, and his demand that Green turn over the keys to the handcuff on his wrist—and his actions soon after the shooting, including his attempts to hide the incriminating evidence and his cogent accounts of the shooting to his friends.

Defendant argues that the OCCA unreasonably determined that no reasonable juror could have accepted his voluntary-intoxication defense because it also made the contradictory factual determination that Defendant was entitled to an instruction on that defense. The court wrote:

> The evidence presented at [Defendant's] trial—in particular, [Defendant's] own testimony about his drug use and the effects it was having on him at the time of the shooting, as well as the testimony of Dr. Smith that [Defendant] could not have formed the intent of malice aforethought— when looked at simply to determine if, *on its face*, it established a prima

22

case of intoxication, certainly was sufficient to raise a voluntary intoxication defense, such that [Defendant] was entitled to have his jury instructed on this defense.

*Malone*, 168 P.3d at 197. But whether the determinations are contradictory depends on what standard the OCCA applied to determine whether Defendant was entitled to the instruction. The OCCA held that the instruction should have been given because there was evidence that, if believed, would support the voluntary-intoxication defense— namely the testimony by Defendant and Dr. Smith. *See id.* at 196–97. That holding is not inconsistent with a determination that, given the trial record as a whole, no reasonable jury would credit that testimony, or at least that part of the testimony asserting Defendant's inability to form the requisite intent.

We conclude that the OCCA was not only reasonable, but persuasive, in determining that the error in the voluntary-intoxication instruction was harmless beyond a reasonable doubt.

We now turn to the other instructional error, which can be disposed of with little discussion. We repeat the challenged instruction:

> "Incapable of Forming Special Mental Element" is defined as the state in which one's mental powers have been overcome through intoxication, rendering it impossible to form the special state of mind known as *willfully*.

R., Vol. 2 at 527 (emphasis added). The OCCA rejected the challenge in a footnote:

> The record contains no explanation of why the "incapable of forming special mental element" definition was included in [Defendant's] instructions, since this term was not otherwise used in the instructions; nor does the record reveal why the "special state of mind" referenced in that definition is "willfully." The record reveals only that it was the trial court who prepared the instructions and that the parties did not object. [Defendant] makes much of the improper inclusion of this definition in his

> instructions, particularly the reference to "willfully." This Court finds, however, that this error was not significant. The phrase "special mental element" was not otherwise used in [Defendant's] instructions; thus a reasonable jury reading its instructions as a whole, as it was directed to do, would have no occasion to apply this definition in [Defendant's] case.

*Malone*, 168 P.3d at 199 n.63. The footnote makes sense to us. The OCCA did not unreasonably apply Supreme Court precedent in holding that the superfluous instruction and its inclusion of the term "willfully" were harmless. And even if Defendant were to question whether the OCCA applied the correct harmless-error standard, we would hold that on independent review the *Brecht* standard has not been satisfied because the error did not have a substantial and injurious effect on the trial.

### B. Ineffective Assistance of Counsel in Failing to Object to Jury Instructions

Defendant argues that his trial counsel was ineffective in failing to object to the instructions on his intoxication defense. To prevail on a claim of ineffective assistance of counsel, a defendant must show both that his counsel's performance was deficient—"that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"—and that "the deficient performance prejudiced [his] defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In conducting this analysis, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted). And to establish that a defendant was prejudiced by counsel's deficient

24

performance, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. "Failure to make the required showing of *either* deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700 (emphasis added).

The OCCA rejected Defendant's ineffective-assistance claim on the prejudice prong. After reciting the standard for prejudice set forth in *Strickland*, the court wrote:

> Regarding the voluntary intoxication jury instructions, this Court has thoroughly addressed this issue [earlier in the opinion]; and the failure of defense counsel to ensure that [Defendant's] jury was accurately and comprehensibly instructed on his theory of defense, *i.e.*, drug-induced intoxication, does suggest deficient and unreasonable performance in this regard. Nevertheless, just as we concluded [earlier] that the instructional errors in this regard were harmless beyond a reasonable doubt, we likewise conclude that [Defendant] could not have been prejudiced thereby.

*Malone*, 168 P.3d at 220–21. The OCCA did not unreasonably apply *Strickland* in holding that Defendant was not prejudiced here. Even had counsel objected to the erroneous instructions, there is no reasonable probability that the jury would have reached a different result, given the overwhelming evidence of Defendant's guilt. We therefore uphold the OCCA ruling.

### C. Ineffective Assistance of Counsel in Belated Expert Preparation

Defendant argues that his trial counsel was ineffective in failing to arrange for a meeting between Defendant and the defense's expert witness, Dr. Smith, until midway

through trial. He contends that had a meeting occurred sooner, the defense could have avoided presenting inconsistent narratives in support of his intoxication defense.

We briefly review the relevant part of the record. Before meeting with Dr. Smith, Defendant asserted that he had no recollection of the murder. In a statement to police, he said that he "couldn't remember" the shooting and that it was "like it didn't happen. It's like it was a dream." 2005 Trial Tr., Vol. 3 at 861. In a pretrial report submitted by Dr. Smith based on his review of materials provided by counsel, Dr. Smith indicated that Defendant had entirely blacked out the events. Defense counsel argued in her opening statement that "methamphetamine . . . causes all kinds of problems. You can't remember what happened; you can't remember what you did. It makes you very forgetful." 2005 Trial Tr., Vol. 2 at 528.

Even upon meeting with Dr. Smith, Defendant at first maintained that he could not remember the shooting. But when Dr. Smith told him that his account did not "make sense because methamphetamine abusers remember delusional memory" and do not have total blackouts, he instead insisted that he was experiencing auditory hallucinations on the morning of the shooting. *Id.*, Vol. 4 at 1121. At trial Dr. Smith adopted the hallucination narrative.

On appeal Defendant argues that his belated interview with Dr. Smith caused significant problems for the defense, both strategic and factual. The defense theory switched from failure to remember the events to hallucinating about the events, and a voluntary-intoxication defense was supplemented by an insanity defense. The switch to

26

the new narrative of events presented multiple opportunities for the prosecution to impeach both Defendant and Dr. Smith.[2]

Again, however, the OCCA did not unreasonably apply Supreme Court precedent in denying relief on this claim. The court did agree with Defendant that counsel's performance was defective:

> This Court does not hesitate to conclude that it is unreasonable and deficient performance for attorneys who are defending a case in which the only plausible defense to first-degree murder involves drug use that impaired the defendant's mental processes—where the fact that the defendant killed the victim is established by overwhelming evidence—to fail to arrange a meeting between the defendant and his chosen expert until the defendant's murder trial is well underway. This certainly does not exemplify diligent trial preparation; and the resulting mid-trial switch of defense theory made the State's task of discrediting [Defendant's] expert witness that much easier.

*Malone*, 168 P.3d at 220. But it found that there was not the requisite prejudice:

> [Defendant] cannot show prejudice, since he cannot demonstrate a reasonable probability that his jury would have rejected the murder charge against him if he had met with Smith earlier. [Defendant] argues that if his attorneys "had not waited until the middle of trial to have their client evaluated by their expert, the true facts of Appellant's memory of events would have come out much sooner." Yet the "true facts" of [Defendant's] memory did come out at trial—just as [Defendant's] memory of what occurred came out the day of the murder, when he accurately described to his friends what happened and what he did. In the current case, it would not have mattered how defense counsel attempted to "contextualize" [Defendant's] mental state. The State's evidence that [Defendant] willfully, knowingly, and deliberately shot Trooper Green, with the intent to kill him, was simply too compelling. Hence even though counsel's failure to arrange a timely (pre-trial) meeting between [Defendant] and his intended expert made impeachment of this witness that much easier for the State, the result

---

[2] In this court, Defendant also argues that an earlier interview would have enabled counsel to obtain a different expert. But we do not address that argument because it was not raised in state court and is therefore procedurally defaulted. *See Ellis v. Raemisch*, 872 F.3d 1069, 1092–93 (10th Cir. 2017)

of the first stage of [Defendant's] trial was not affected thereby. [Defendant] would still have been convicted of the first-degree murder of Green.

*Id.* In other words, even if Dr. Smith had been interviewed well before trial and the defense had put on a coherent theory with consistent testimony, the evidence of the crime would have compelled the jury to convict. We would add that extensive impeachment of Defendant and Dr. Smith would likely have occurred even if the interview had been conducted much sooner. Defendant would have been impeached by his statements to the police and his friends, which mentioned no voices or hallucinations. And it is likely that an earlier meeting between Defendant and Dr. Smith would have transpired in the same manner as the midtrial meeting—with Defendant initially insisting that he blacked out the shooting until learning that account was inconsistent with heavy methamphetamine use. The OCCA's determination that Defendant was not prejudiced by the belated expert meeting was not unreasonable.

### D. Cumulative Error

Defendant's final claim is that the cumulative effect of the erroneous jury instructions, counsel's failure to object to the jury instructions, and counsel's belated expert preparation deprived him of a fair trial. A cumulative-error analysis "aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003) (internal quotation marks omitted). Claims should be included in a cumulative-error analysis even if "they

28

have been individually denied for insufficient prejudice." *Id*. at 1207. We have awarded relief when the errors had an "inherent synergistic effect" on the outcome. *Id*. at 1221,

On direct appeal to the OCCA, Defendant argued that the accumulation of all the errors at his trial merited relief. The OCCA, however, considered only those errors stemming from Defendant's "challenge to the intoxication jury instructions" in ruling on Defendant's cumulative-error claim. *Malone*, 168 P.3d at 233. We therefore choose to apply the *Brecht* harmless-error standard to Defendant's claim.

Under that standard, we hold that the cumulative errors did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. The evidence against Defendant was far too compelling.

## IV.    CONCLUSION

We **AFFIRM** the district court's order denying Defendant's § 2254 application. We **DENY** Defendant's motion to grant a certificate of appealability on additional issues except insofar as this court has already done so.