**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**August 19, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

ALEXANDER POGOSYAN,

    Petitioner - Appellant,

v.

PHILIP WEISER, Attorney General for
State of Colorado; TERRY JAQUES,
Warden, Limon Correctional Facility,

    Respondents - Appellees.

No. 23-1224
(D.C. No. 1:22-CV-00368-NYW)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **McHUGH**, **MURPHY**, and **FEDERICO**, Circuit Judges.
_____

## I.    Introduction

On September 7, 1998, five people were murdered during shootings at two

different residences in Aurora, Colorado. Eyewitnesses reported two armed

individuals at both sites, with two additional companions present outside the scene of

the first shooting. It is undisputed that Michael Martinez, a friend to petitioner

Alexander Pogosyan, was one of the shooters at both locations. According to the

prosecution, Pogosyan was the second shooter and his brother, Roman Pogosyan

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

("Roman"), and friend, Artur Martirosyan, were the other two individuals outside the first shooting. In support of its case, the state introduced a videotaped interview of Martirosyan, in which he described the days' events and identified Pogosyan as the second shooter. Given that Martirosyan had disappeared by the time of trial, the recording was admitted under Colo. R. Evid. 804(b)(3) as a statement against penal interest. Pogosyan objected to the introduction of the interview as violative of his Confrontation Clause rights under the Sixth Amendment of the U.S. Constitution. His objection was overruled and he was unsuccessful in his state court appeals.

Pogosyan asserted the Confrontation Clause claim in his application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Applying the standard of review outlined in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the district court determined the Colorado Court of Appeals ("CCOA") contravened clearly established Supreme Court precedent in ruling Martirosyan's interview was sufficiently reliable to overcome constitutional concern. The district court determined the absence of particularized guarantees of trustworthiness in Martirosyan's statement compromised Pogosyan's Sixth Amendment rights. It concluded, however, that the CCOA's error was harmless. This court holds that any Confrontation Clause error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993) (quotation omitted). Thus, exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a), we **affirm** the judgment of the district court.

2

## II.      Factual Background

### a.  Overview

On September 7, 1998, shootings occurred at two homes in Aurora. The crimes resulted in five deaths: Zach Obert and Ed Morales, both eighteen-years-old, were shot and killed in a residence on South Paris Way at roughly 1:00 p.m. (the "Paris Shooting"); and Marissa Avolos, age sixteen; Greg Medla, age eighteen; and Penny Bowman-Medla, age thirty-six, were shot and killed in a home on East Harvard Avenue around 2:00 p.m. (the "Harvard Shooting"). Eyewitnesses placed two armed individuals at both shootings, and two additional companions outside the site of the Paris Shooting. The parties do not dispute that one of the armed shooters was Michael Martinez, who was shot and killed on the evening of September 7 by an unknown individual. Evidence introduced at trial indicated Martinez was motivated by his perception that at least one of the victims had "snitched" on him in relation to his involvement in a recent drive-by shooting.

The parties also do not dispute that the four individuals present outside the Paris Shooting were Martinez and his fellow teenage friends: Pogosyan, Martirosyan, and Roman. Evidence offered by the state demonstrates Martirosyan drove the group to the Paris Shooting location at Martinez's behest in the early afternoon on September 7. Upon arrival around 1:00 p.m., Martinez retrieved two shotguns he had previously stowed in the trunk of Martirosyan's vehicle. He gave one to Pogosyan and the pair entered the home on Paris Way. They fired several shots, killing Obert and Morales, before returning to the car and exiting the scene with Martirosyan and

3

Roman. Martirosyan then dropped Martinez and Pogosyan off at the Martinez family home. Evidence further demonstrates that shortly thereafter, around 2:00 p.m., Martinez and Pogosyan entered a nearby residence on East Harvard Avenue with the same shotguns. Again, they fired several shots, killing Avolos, Medla, and Bowman-Medla, before fleeing the scene on foot.

The state charged Pogosyan with five counts of first-degree murder after deliberation, five counts of first-degree felony murder, two counts of conspiracy, two counts of first-degree burglary, and one count of being an accessory. The defense claimed Roman was the second shooter, but he was neither called as a witness in his brother's case, nor was he ever charged with a crime. Four days after the shootings, on September 11, police recorded an interview with Martirosyan. In his description of events surrounding the first shooting, Martirosyan identified Pogosyan as the second shooter. Martirosyan's whereabouts at the time of trial, however, were unknown and he was not available to testify. In turn, the state trial court admitted the recorded interview as a statement against penal interest under Colo. R. Evid. 804(b)(3). *See infra* § III.a.ii. Pogosyan unsuccessfully objected to the introduction of the interview evidence as infringing on his Confrontation Clause rights under the Sixth Amendment. After a lengthy trial, he was convicted of five counts of felony murder; five counts of second-degree murder; two counts of second-degree burglary; and one count of accessory to a crime. He is currently serving five consecutive life sentences with the possibility of parole. Following unsuccessful appeals in the state court system, Pogosyan filed this petition for writ of habeas corpus.

4

### b. Witnesses

### i. Martirosyan's Interview

Martirosyan was interviewed by the police three times before he disappeared. The first interview took place at his high school four days following the shootings, on September 11. At the time, he denied knowing anything about the murders. Martirosyan was asked to interview two additional times at the police station, once later on September 11 and once on September 12. Both of these interviews were recorded. The statement played for the jury was an edited, ninety-minute version of his first interview at the police station. The recording primarily consisted of Martirosyan responding to questions posed by detectives, which were often leading. The jury was allowed to view the video recording one time, and it was not transcribed into the record. The jury asked to review the recording further during its deliberations, but the request was denied.

In the recording shown to the jury, Martirosyan generally described the relevant events he witnessed and in which he participated on September 7. His interaction with Pogosyan and Martinez began when he drove to pick up Pogosyan from his home and then stopped at a local hospital to pick up Martinez. Upon entering the car, Martinez began making generalized threats, including "they snitched on me" and "everybody's going down." Martinez directed Martirosyan to drive to Martinez's home, where he wanted to fetch kitchen knives. Martinez's father, however, would not allow him to take the knives. Instead, Martinez returned to the

5

vehicle with a "sport bag," which he directed Martirosyan to place in the trunk of the car. Martinez then instructed Martirosyan to pick up Roman.

Once Roman was in the car, Martinez told Martirosyan to drive to the Paris Shooting location. As an explanation for the destination, Martinez explained the sport bag contained shotguns which he planned to hide there. Once they reached the residence, Martirosyan parked the vehicle and all four individuals got out of the car. Martirosyan then opened the trunk and Martinez removed two black, pistol-grip, 12-gauge shotguns from the bag. He gave one firearm to Pogosyan and kept one himself. Martinez then instructed Martirosyan to turn the car around in the parking lot and keep it running. Martinez and Pogosyan entered the home, and Martirosyan heard four or five gunshots shortly thereafter. Once the pair returned to the car, the foursome drove away with Martirosyan at the wheel. After departing the scene, Martirosyan described Pogosyan as quiet and Martinez as animated, stating excitedly that "[he] blew his brains out." Martinez then tried to convince Martirosyan to drive to a neighboring suburb so he could kill his girlfriend. Martirosyan refused and dropped Pogosyan and Martinez off at the Martinez residence instead.

After parting with Pogosyan and Martinez, Martirosyan stated that he and Roman returned to the Pogosyan household. Martirosyan did not see Martinez or Pogosyan until later in the day, when he received a call to pick them up outside a Home Depot. He and Roman drove to pick up Martinez and Pogosyan. When the group was reunited, Martinez continued to gloat, claiming that he "blew her brains out." Martirosyan noted that Martinez and Pogosyan were dressed differently than

6

they had been at the Paris Shooting location: Pogosyan was now wearing the shirt Martinez had on earlier. After departing Home Depot, Martinez told Martirosyan to drive to where he had previously hidden the shotguns, but Martirosyan refused and drove back to the Pogosyan residence where the group parted ways. Martirosyan reported that he drove home at approximately 4:30 p.m. and had no further contact with Pogosyan until he called Martirosyan around 9:30 p.m., sounding sad. Pogosyan told Martirosyan, "they got [Martinez] and I'm waiting for my turn."

### ii. Steven Lawson's Testimony

Steven Lawson was a friend and neighbor to Martinez. Both lived in the Telegraph Hills apartment complex with their families. Lawson was also familiar with Pogosyan and encountered the pair shortly after 2:00 p.m. on September 7. Lawson reported that Martinez arrived unannounced at his home, carrying a shotgun and yelling that he had just "smoked Greg, Marissa," and others. Martinez demanded Lawson drive him to an Outback Steakhouse where his girlfriend worked because he wanted to kill her. Lawson grabbed the keys to his mother's vehicle and exited the apartment with Martinez. On the way down the stairs, they ran into Pogosyan who was also holding a shotgun. All three went to Lawson's car and, as they entered the vehicle, Martinez told Pogosyan he had "brains" on his shirt. Lawson noticed a red circle on Pogosyan's clothing.

Lawson drove Martinez and Pogosyan to the Outback Steakhouse. During the drive, Martinez took off the shirt he was wearing over a tank top and passed it to Pogosyan to put on. Lawson reported that Martinez was excited and bragging about

7

the shootings. At one point, Martinez stated that Pogosyan "shot Za[ch]." Pogosyan did not respond to the comment. Lawson described Pogosyan as generally reserved, but he reported Pogosyan referred to shooting someone himself; stated it was "cool" when "Marissa's head exploded"; and said, "we should slow down, we shouldn't have killed more people."

Martinez did not see his girlfriend's car parked outside the Outback Steakhouse, so the trio kept driving. Martinez said he needed to make a telephone call, so Lawson stopped at a nearby Burger King. Police independently confirmed that a call was made from a pay phone at the Burger King to the Pogosyan residence at 2:42 p.m. Martinez returned to the vehicle and announced he had arranged another ride. Lawson, Martinez, and Pogosyan then had a conversation about hiding the shotguns. Lawson proceeded to drive to a wooded area where the guns were hidden in a grove of trees. Next, he drove Martinez and Pogosyan to a Home Depot where they were picked up by Martirosyan and Roman.

After departing the Home Depot, Lawson drove back to his apartment where he found the complex blocked off by police. Lawson talked to officers at the scene, but he reported nothing about his interactions with Martinez and Pogosyan. At the urging of other friends, however, Lawson agreed to talk to the authorities later that day. In addition to providing a statement, Lawson rode with a detective to where the shotguns were hidden. The firearms had been removed but they discovered Martinez's dead body.

### iii.  Additional Third-Party Witnesses

Several additional third-party witnesses helped investigators verify the events of September 7. Barbara Springston was a neighbor to the South Paris Way residence. She witnessed four young men in the parking lot in front of her home around 1:00 p.m. She watched them take objects out of the trunk of a silver car and observed as two individuals ran across around the corner holding long guns. She subsequently heard two rounds of shots, approximately five to ten seconds after the pair disappeared from sight and watched as they returned quickly to the car. Springston confirmed Martinez was one of the individuals who took a gun into the adjacent building, but she could not positively identify Pogosyan as the second. Bernard Harris was with Springston at the time of the shooting and verified he also heard gunshots and saw two individuals running with firearms toward the parked silver vehicle outside Springston's residence.

Jimmy Jarman was outside his home near the location of the Harvard Shooting when he heard voices and witnessed two teens with shotguns walk towards the house across the street. Jarman went inside and told his stepbrother, Derrick Boesel, what he saw. Jarman then heard shots and observed the same two teenagers, still carrying the firearms, exit the residence and run toward the Telegraph Hills apartment complex. Boesel also reported hearing gunshots and called 9-1-1 as he witnessed the teens run towards Telegraph Hills.

Kayla Reichert was seven years old and present inside the East Harvard residence when the second shooting occurred. She heard two loud bangs while on the

second floor of the home and heard several more as she approached the stair landing. She observed a young man she recognized as Martinez running upstairs from the basement with a gun. Reichert did not witness a second shooter on the scene.

Finally, between 6:00 p.m. and 7:00 p.m. on September 7, Pogosyan asked a friend, Robbie Chermela to pick him and Martinez up near Pogosyan's house. She arrived with her friend, Jordan Jensen, and the group drove to a Taco Bell to use a telephone at Pogosyan's request. In the car, Martinez was acting aggressive and bragged that "he capped five people in the head." When Chermela objected to his language, Martinez responded by telling her that she should not make herself the sixth person he kills that day. Chermela was so upset by Martinez's comments that she and Jensen drove off while Martinez and Pogosyan were inside the Taco Bell.

### iv.  Confessions & Admissions

As noted *supra* Parts II.b.i and ii, Pogosyan implied his guilt in a phone conversation with Martirosyan on September 7 when he stated, "they got [Martinez] and I'm waiting for my turn" and explicitly confessed to murder while in the car with Lawson. In addition to these admissions, the state offered evidence of several other proximate, incriminating conversations Pogosyan had with witnesses surrounding the shootings.

Throughout the day on September 7, Pogosyan shared several phone calls with a close friend, Noelle Peterson. In her testimony, she described Pogosyan as "moody" and at one point "on the verge of tears." That evening, Pogosyan confessed to her that he and Martinez had killed five people, with him personally murdering three. He

told her that he "was either going to kill himself or spend the rest of his life in jail." Pogosyan also said Chermela "was a bitch" and had "ditched him." Peterson told her friend, Talitha McCoy, about the conversation with Pogosyan later on September 7. In separate testimony, McCoy corroborated Peterson's narrative, stating that she relayed Pogosyan's description of the shootings and his fear that he was going to jail.

Jose Soriano was a friend of both Martinez and Pogosyan. After learning that Martinez was a suspect in two shootings from an evening newscast on September 7, Soriano spoke to Pogosyan over the phone. Pogosyan told Soriano that he had been with Martinez and stated that "we shot a dude, Zach, Ed, Marissa and her mom" and "we just blasted all of them." He confessed that he had never seen so much blood; that the pair "shot everybody" and "everybody is dead"; and he told Soriano that Martinez was dead. Soriano's mother testified at trial to verify that her son had a telephone conversation with Pogosyan that evening.

The prosecution also offered evidence produced by two jailhouse informants. First from Galen Felder, who was an inmate with Pogosyan in February 1999. Although Felder testified he does not recall doing so, a detective relayed that Felder told authorities Pogosyan had confided in him that (a) he and a friend named Mike killed five people with shotguns; and (b) his case was one of the biggest in Colorado. The second informant, Bruce Stovall, was an inmate with Pogosyan in September 1998. He produced a note written by Pogosyan which stated, "I am not even supost

11

[sic] to say anything to nobody[.] [I]f we say anything about guns they think they can get som[e] clues and other shit it[']s to[o] risky for me[.]"[1]

### III.  Procedural Background

#### a.  Legal Standards

##### i.  Habeas Review

A petition for writ of habeas corpus resulting from the merits-based judgment of a state court shall not be granted unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see, e.g.*, *Cole v. Trammell*, 755 F.3d 1142, 1148 (10th Cir. 2014). Here, neither party argues the state court decision involved an unreasonable determination of facts and, therefore, this appeal implicates only the rule outlined in § 2254(d)(1).[2] "A state court's decision is contrary to clearly established federal law

---

[1] Pogosyan highlights several facts about various witnesses in an attempt to undermine their credibility. He argues Lawson strategically implicated Pogosyan only after he personally became a suspect in the investigation; Peterson was unduly compelled to frame Pogosyan by district attorneys and her probation officer; Soriano was also on probation and only accused Pogosyan because he did not want to be sent back to jail; and the jailhouse informants were desperate to reduce their own sentences.

[2] Although Pogosyan purports in his opening brief to bring a challenge under § 2254(d)(2), he does not substantively argue the CCOA's decision was based on an unreasonable determination of the facts.

when it applies a rule that contradicts the governing law set forth in Supreme Court cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that precedent." *Cortez-Lazcano v. Whitten*, 81 F.4th 1074, 1082 (10th Cir. 2023) (quotations omitted). An unreasonable application of the law occurs when a state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular petitioner's case." *Id*. (quotation omitted). For purposes of § 2254(d)(1), "clearly established Federal law . . . refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Bonney v. Wilson*, 754 F.3d 872, 880 (10th Cir. 2014) (quotations and alteration omitted).

If a federal court determines the state court decision was an unreasonable application of, or contrary to, clearly established Supreme Court precedent, it proceeds to de novo review of the matter. *Harmon v. Sharp*, 936 F.3d 1044, 1056 (10th Cir. 2019). Included in this analysis is harmless error review. *See Littlejohn v. Trammell*, 704 F.3d 817, 844 (10th Cir. 2013) (noting that Confrontation Clause errors are subject to harmless error review). In the habeas context, the harmless error standard announced in *Brecht* applies. *Id*. To reverse pursuant to *Brecht*, the error must have "had substantial and injurious effect or influence in determining the jury's

verdict." 507 U.S. at 638 (quotation omitted).[3] This court has clarified that "[a] petitioner prevails under *Brecht* if the court is left with grave doubt about whether the error was harmless." *Malone*, 911 F.3d at 1029 (quotation omitted). "Grave doubt exists where the issue of harmlessness is so evenly balanced that the court feels itself in virtual equipoise as to the harmlessness of the error." *Littlejohn*, 704 F.3d at 834 (quotations omitted). In analyzing whether error was harmless in the context of Confrontation Clause violations, we are guided by several factors announced in *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *See also Littlejohn*, 704 F.3d at 845.

### ii.  Statements Against Penal Interest

Pursuant to Colo. R. Evid. 804(b)(3)(A), an out-of-court statement typically subject to hearsay exclusion may be admitted if it incriminates the declarant to such a degree that a reasonable person would have only made the statement if the person

---

[3] As this court has regularly noted, the *Brecht* standard is not to be confused with the harmlessness standard that applies to constitutional errors on direct appeal. There, "reversal is required for constitutional error unless the error was 'harmless beyond a reasonable doubt.'" *Malone v. Carpenter*, 911 F.3d 1022, 1029 (10th Cir. 2018) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)); *see also Tuttle v. Utah*, 57 F.3d 879, 883–84 (10th Cir. 1995).

believed it to be true. Even if evidence qualifies as an admissible statement against penal interest, however, it still can violate a defendant's Confrontation Clause rights. *See Stevens v. People*, 29 P.3d 305, 311 (Colo. 2001), *overruled on other grounds by People v. Fry*, 92 P.3d 970 (Colo. 2004). At the time of Pogosyan's trial, "[t]he Confrontation Clause only permit[ted] the admission of hearsay evidence where 'the declarant's truthfulness [was] so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility.'" *Id*. (quoting *Lilly v. Virginia*, 527 U.S. 116, 136 (1999)). Under such circumstances, statements against penal interest did not violate a defendant's Sixth Amendment rights if the declarant was unavailable and "the declarations either f[ell] within a 'firmly rooted hearsay exception' or b[ore] 'particularized guarantees of trustworthiness.'" *Id*. (quoting *Ohio v. Roberts*, 448 U.S. 56, 66 (1980)).[4]

With regard to firmly rooted hearsay exceptions, Supreme Court guidance at the time of Pogosyan's trial was that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Lilly*, 527 U.S. at 134. In the same plurality opinion, the Supreme Court clarified several factors that should not be considered when attempting to rebut "the presumption of unreliability

---

[4] Although there have been substantial changes to Confrontation Clause jurisprudence since Pogosyan's trial, *see Crawford v. Washington*, 541 U.S. 36, 62 (2004), the parties agree that *Roberts* governed during the relevant timeframe and controls for purposes of Pogosyan's habeas petition.

15

that attaches to codefendants' confessions." *Id*. at 137 (quotation omitted).[5] Those

unhelpful factors include the following: "(1) the voluntariness of an accomplice's

confession; (2) the presence of corroborating evidence; (3) the absence of an offer of

leniency; and (4) the presence of statements strongly against penal interest." *Farrell*

*v. Soares*, 211 F. App'x 766, 773 (10th Cir. 2007) (citations omitted) (unpublished

disposition cited solely for explanatory value).

### b. Procedural History

Pogosyan appealed the trial court's admission of Martirosyan's interview to

the CCOA. The CCOA recognized that statements made by accomplices are

presumptively unreliable and constitute a threat to a defendant's Confrontation

Clause rights. In analyzing the elements required for a hearsay exception pursuant to

Colo. R. Evid. 804(b)(3), the CCOA determined Martirosyan was, in fact,

unavailable to testify and the recording contained ample content exposing him to

criminal liability. The court's Confrontation Clause analysis, therefore, turned on

whether there existed corroborating circumstances that clearly indicated the

statement's trustworthiness. The CCOA concluded several factors contributed to the

reliability of Martirosyan's statement, including that it was (a) detailed; (b) made

shortly after the relevant events; (c) "not in response to promises, suggestions of

---

[5] Despite being decided by a plurality, this court previously rejected the argument "that the holdings of the four-Justice *Lilly* plurality are not clearly established federal law" for purposes of AEDPA analysis under habeas review. *Stevens v. Ortiz*, 465 F.3d 1229, 1237 (10th Cir. 2006).

favorable treatment, or threats by police"; (d) not blame-shifting; and (e) seriously incriminating. In turn, the court affirmed the trial court's admission of the interview and Pogosyan's convictions. On October 27, 2003, the Colorado Supreme Court summarily denied Pogosyan's petition for writ of certiorari. State court postconviction proceedings lasted from 2003 to 2021.[6]

On February 10, 2022, Pogosyan filed an application for writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising his Confrontation Clause objection to the admission of Martirosyan's interview at trial. The district court determined that the statements did not fall within a well-established hearsay exception and the CCOA construed reliability from factors previously condemned by *Lilly*. Specifically, the court determined the CCOA improperly relied upon "the voluntariness and self-inculpatory nature of the statement and the absence of a promise of leniency."

After concluding the CCOA's analysis conflicted with clearly established Supreme Court precedent and, as a result, was not due deference under § 2254(d)(1), the district court proceeded to review Pogosyan's Sixth Amendment challenge de novo. It determined the reliability of Martirosyan's statement was not "so apparent from the record that cross-examination at [Petitioner's] trial would have been only of marginal utility." In reaching this conclusion, the court highlighted the presumptive unreliability of the statement; Martirosyan's attempts at exculpation; the leading

---

[6] The state does not argue Pogosyan's Confrontation Clause claim is untimely or unexhausted on habeas review.

17

questions used by detectives; inconsistency in the interview's narrative; and Martirosyan's outstanding "fugitive status."

The district court then proceeded to harmless error review under the *Brecht* standard utilizing the factors outlined in *Van Arsdall*. Addressing each factor individually, the court determined Pogosyan was not prejudiced by the introduction of Martirosyan's interview and the CCOA's error was harmless. The district court concluded two of the factors, overall importance and lack of cross-examination, both weighed in Pogosyan's favor. Nonetheless, the court described the interview as neither "critically important" nor an "essential component of the State's case." The district court concluded Martirosyan's implication of Pogosyan's guilt was cumulative, corroborated by other evidence, and uncontradicted. The court particularly emphasized the strength of the prosecution's case, focusing heavily on Pogosyan's multiple confessions to several witnesses. Thus, the court determined it was not in "grave doubt" regarding whether the introduction of Martirosyan's interview had a "substantial and injurious effect or influence in determining the jury's verdict." In light of Pogosyan's "substantial showing of the denial of his Sixth Amendment right to confrontation," however, the court issued a certificate of appealability. *See* 28 U.S.C. § 2253(c).

## IV.    Analysis

### a.  Standard of Review

"On appeal from orders denying a writ of habeas corpus, we review the district court's legal analysis of the state court decision de novo and its factual findings, if

any, for clear error." *Smith v. Sharp*, 935 F.3d 1064, 1071 (10th Cir. 2019) (quotation omitted); *see also Jones v. Gibson*, 206 F.3d 946, 957 (10th Cir. 2000) ("This court's harmless error review is de novo."). As described *supra* Part III.a.i, as long as a state court ruled on the merits of an issue, AEDPA governs this court's review of federal habeas claims. *Sharp*, 935 F.3d at 1071. Nonetheless, addressing whether a state court decision is contrary to, or an unreasonable application of, clearly established federal law is not necessary when the petitioner cannot, in any event, prevail upon de novo review. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can, however, deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review."); *see also Webber v. Scott*, 390 F.3d 1169, 1175 (10th Cir. 2004) ("The question of whether the [state court] reached the merits need not be decided, however, because [defendant's] claim fails with or without according the state court's decision AEDPA deference."). Such is the case here. Even assuming Pogosyan has overcome § 2254(d)(1) by demonstrating the CCOA decision was contrary to *Lilly* and *Roberts*, he still cannot prevail on de novo review because the Confrontation Clause error is harmless under *Brecht*. Employing the factors set out in *Van Arsdall*, this court exercises its discretion to affirm on these grounds. *See United States v. Chavez*, 976 F.3d 1178, 1203 n.17 (10th Cir. 2020) (noting this court may affirm on any ground adequately supported by the record).

19

### b. *Brecht & Van Arsdall*

Pogosyan asserts each *Van Arsdall* factor—cross-examination, importance, cumulativeness, corroboration or contradiction, and strength of case—weigh in his favor to establish prejudice under *Brecht*.[7] Indeed, some factors support his position. It is undisputed Martirosyan was not subject to any cross-examination, thereby underscoring the potential for a confrontation violation. *Cf. Crespin v. New Mexico*, 144 F.3d 641, 650 (10th Cir. 1998). Similarly, there is little doubt the recording was important to the prosecution's case. At trial, the state described Martirosyan as a "key witness[]." *See Tuttle*, 57 F.3d at 886 (noting the prosecution's classification of a witness as "most important" reflects importance for *Van Arsdall* analysis). Likewise, Martirosyan's interview offered a unique, first-person perspective on the events of the Paris Shooting. Contrary to the district court's conclusion, therefore,

---

[7] Additionally, Pogosyan advocates this court entertain two additional factors not included in *Van Arsdall*. The first explores the potential prejudicial effect of disputed testimony being communicated at trial through a law enforcement witness. *See Fratta v. Quarterman*, 536 F.3d 485, 511 (5th Cir. 2008). The second considers how disputed evidence particularly addresses the elements of a crime. *See Hill v. Hofbauer*, 337 F.3d 706, 720 (6th Cir. 2003). Both out-of-circuit cases Pogosyan cites to support his assertions can be factually distinguished. Unlike here, the disputed testimony in *Fratta* was not substantially corroborated by other evidence. 536 F.3d at 511. In *Hill*, the disputed evidence was relevant to establishing the defendant possessed the requisite intent for conviction. 337 F.3d at 720. Martirosyan's statement was not similarly required to establish any element of Pogosyan's crimes. *See infra* n.8. Moreover, Pogosyan merely states the holdings of these cases without making any effort to apply them to the facts or law at issue in his appeal. Accordingly, we are inclined to classify these arguments as undeveloped and, therefore, waived. *Nelson v. City of Albuquerque*, 921 F.3d 925, 931 (10th Cir. 2019).

Martirosyan's statement cannot be dismissed as entirely cumulative. *See Gibson*, 206 F.3d at 957.

This court, however, views "error in light of the evidence presented at trial as a whole" when conducting harmless error review under *Van Arsdall. Crespin*, 144 F.3d at 649; *see also Littlejohn*, 704 F.3d at 845 & n.13. When considered in totality, the record provides ample corroborative evidence which, as a result, lessens the importance of Martirosyan's interview and increases its cumulative effect. *See Littlejohn*, 704 F.3d at 845–46 (noting the contested testimony "was hardly the central evidence in the prosecution's case" and that "even if the [contested] testimony was not entirely cumulative other evidence corroborated it" (quotation and alterations omitted)). Additionally, Pogosyan fails to identify any substantial evidence inconsistent with Martirosyan's testimony. Collectively, therefore, the record demonstrates the prosecution's case was quite strong. *Tuttle*, 57 F.3d at 888.

The central thrust of this case revolved around identifying the second shooter. Thus, the critical import of Martirosyan's statement was its contribution to placing Pogosyan with Martinez inside the Paris Shooting residence.[8] As the state

---

[8] Pogosyan argues Martirosyan's interview was also important for establishing his motive for participating in the crimes. In his statement, Martirosyan suggested that Pogosyan joined Martinez's spree because he wanted to be "down with" him. Pogosyan contends this evidence elevates the importance and diminishes the cumulative effect of the interview. Not only did the state introduce alternative evidence implicating Pogosyan's motive, but the jury also acquitted him of any charges upon which motive would bear. This court, therefore, does not perceive any prejudice resulting from Martirosyan's statement regarding motive.

21

emphasized at trial, however, Martirosyan's interview was not necessary to find Pogosyan guilty. Contrary to his arguments, the recording was far from the only evidence demonstrating Pogosyan was involved in the first shooting. Most convincingly, Pogosyan personally admitted to the murders to three separate witnesses on the day of the crimes. He told Lawson he shot someone and stated, "we shouldn't have killed more people," thereby implying his participation in both shootings. He was quite vivid in his descriptions with Peterson, expressing deep remorse over killing five people. He was similarly distraught with Soriano, to whom he specifically identified four out of five of his victims. He also conveyed his guilt to two incarcerated peers, including directly telling one that he had killed several people with shotguns. This series of proximate, mutually corroborative admissions illustrates Martirosyan's statement was cumulative insofar as it identified Pogosyan as the second killer and, in turn, shows the interview was not indispensable to the prosecution's case. *See Littlejohn*, 704 F.3d at 845–46.

Pogosyan contends many of the state's witnesses were motivated or pressured to fabricate the truth. *See supra* n.1. The witnesses' testimony, however, was substantially corroborated throughout the record. *See generally United States v. Griffith*, 65 F.4th 1216, 1222 (10th Cir. 2023) ("The presence of . . . corroborating evidence undercuts the impact of . . . opinion testimony on credibility."). For instance, Peterson's account of her phone calls with Pogosyan were independently verified by her close friend McCoy. Similarly, Soriano's testimony was confirmed in part by his mother, whom he talked to shortly after calling Pogosyan on September 7.

Moreover, the witnesses and their statements were thoroughly cross-examined to allow the jury to adequately evaluate credibility. *See, e.g.*, *United States v. Hill*, 749 F.3d 1250, 1260 (10th Cir. 2014) (noting the exclusive function of the jury to assess witness credibility).

Martirosyan's interview and other witnesses' corroborative statements were also strongly supported by several additional third-party witnesses. Most importantly, Springston and Harris delivered descriptions of the Paris Shooting as it occurred outside their home which largely matched Martirosyan's own statement. The recording was also verified by Lawson, who accompanied Pogosyan and Martinez to the Burger King where they made an independently verified call to the Pogosyan residence to arrange a ride. Lawson's testimony further matched Martirosyan's statement by confirming that he dropped Pogosyan and Martinez off at the Home Depot shortly before Martirosyan picked them up at the same location and that Martinez had lent Pogosyan his shirt earlier in the afternoon. Likewise, robust third-party testimony verified the confessions reported by other witnesses. Jarman and Boesel provided eye-witness testimony of the Harvard Shooting, identifying two suspects with shotguns fleeing on foot. Additionally, Jensen verified that he and Chermela did, in fact, "ditch" Pogosyan and Martinez at the Taco Bell as separately described by Pogosyan in his call with Peterson following the murders.

Critically, *Van Arsdall* encourages the consideration of not just corroborative evidence, but also that which contradicts the improperly admitted statements. 475 U.S. at 684. Here, Pogosyan offers very little to counter the substantial evidence

23

indicating he was with Martinez throughout September 7 and acted as the second shooter at both crime scenes. Pogosyan focuses on the lack of physical evidence tying him to the scene of the crimes. He claims what little physical evidence exists supports the conclusion that Lawson or Roman was the second shooter. Considering all the relevant facts and circumstances, Pogosyan has not, however, explained how the lack of physical evidence implicating him demonstrates weakness in the state's case. *See United States v. Magallanez*, 408 F.3d 672, 681 (10th Cir. 2005) (holding, albeit in the context of sufficiency review, that direct and circumstantial evidence often render the absence of physical evidence meaningless). Direct and circumstantial evidence, such as the set of corroborative witnesses presented here, can fully support a jury's guilty verdict. *Id*. Further, the physical evidence Pogosyan points to is highly attenuated and does not come remotely close to affirmatively identifying any other suspect.[9] Absent contradictory evidence, the record contains ample, closely aligned accounts of the events of September 7, many of which place Pogosyan with Martinez and describe direct, proximate admissions of guilt from Pogosyan himself. This highly corroborative evidence demonstrates the strength of the prosecution's case and underscores that the admission of Martirosyan's interview did not meaningfully

---

[9] Most significantly, Pogosyan points to a latex glove and a pair of black sweatpants found in a dumpster behind the residence of one of Roman's friends. DNA from both items matched unidentified DNA found in Roman's room and the latex glove was of the same kind worn by Martinez. These facts do little to prove that anyone, Roman or otherwise, was the second shooter.

24

impact the trajectory of the state's case.[10] Accordingly, considering the full breadth of the *Van Arsdall* factors in the context of the complete record, we are not in "grave doubt" that the state court's Confrontation Clause error was harmless and, instead, conclude the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Carpenter*, 911 F.3d at 1029 (quotations omitted).[11]

---

[10] Pogosyan argues that several aspects of the jury's decision process demonstrate weakness in the prosecution's case. Specifically, he notes jury deliberations were long; Pogosyan was acquitted on the most severe charges brought; the jury requested to view Martirosyan's statement a second time; and one juror expressed feeling pressured into a guilty verdict. To opine on the effect of any of these occurrences would require "speculation into what transpired in the jury room," which courts avidly avoid. *See Owens v. Trammell*, 792 F.3d 1234, 1248 (10th Cir. 2015) (quotation omitted); *see also generally United States v. Coulter*, 57 F.4th 1168, 1191 (10th Cir. 2023) (discussing the limited impact of individual juror pressure inside the jury room in the Sixth Amendment impartial jury context). Although jury proceedings may implicate the importance of a piece of evidence or bear on the strength of the prosecution's case, we are reluctant to give such speculative inquiry significant weight. *But see Vasquez v. Jones*, 496 F.3d 564, 576 (6th Cir. 2007) ("The jurors too seemingly thought [the disputed testimony] significant because they asked to review the transcript during deliberations.").

[11] Pogosyan analogizes his circumstances to several out-of-circuit cases which he describes in detail in his opening brief. In each, the circuit concluded that a Confrontation Clause error was not harmless under *Brecht*. Each case, however, is factually distinct from the one at hand. Most glaringly, none of Pogosyan's cited authorities contain the same robust level of corroborative evidence available here. In turn, each court characterized the disputed evidence as indispensable to the prosecution's case. *See Rhodes v. Dittmann*, 903 F.3d 646, 667 (7th Cir. 2018) (the disputed evidence was "central" and without it "the jury was left without key facts relevant to . . . [the defendant's] guilt"); *McCarley v. Kelly*, 801 F.3d 652, 667 (6th Cir. 2015) ("Had the jury not heard and considered [the disputed evidence] identifying [defendant] as the perpetrator, the State's case would have been almost entirely circumstantial."); *Jensen v. Clements*, 800 F.3d 892, 904–06 (7th Cir. 2015) (the disputed evidence "was unlike anything else in evidence" and was "make or break" for the state's prosecution); *Vasquez*, 496 F.3d at 576 (the disputed evidence was "crucial" and acted as a "tiebreaker" amongst limited evidence). We, therefore, do not find these examples persuasive.

## V.    Conclusion

The denial of Pogosyan's § 2254 habeas petition by the United States District Court for the District of Colorado is hereby **AFFIRMED**.

Entered for the Court


Michael R. Murphy
Circuit Judge